Marchell D. SMITH, Plaintiff,

v.

BEVERLY HEALTH AND REHABILI-
TATION SERVICES, INC., a California
Corporation; and Medical Arts Health
Facility of Lawrenceville, Inc., a Geor-
gia Corporation, Defendants.

Civil Action No. 1:96–CV–200–FMH.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 24, 1997.

Frank J. Beltran—Beltran & Bills, Atlanta, GA; Mark Earle Layng—Office of Mark Earle Layng, Lilburn, GA, for Plaintiff.

Ann Bachman Hale–Smith & Gary Richard Kessler—Irvin, Stanford & Kessler, Atlanta, GA, for Defendants.

### ORDER

HULL, District Judge.

Plaintiff Marchell D. Smith brings this employment discrimination action against Defendants under Title VII and § 1981. This matter is before the Court on Magistrate Judge John R. Strother's Report and Recommendation [19–1] recommending that this Court deny Plaintiff's Motion for Summary Judgment [11–1] and grant Defendants' Motion for Summary Judgment [10–1] on all of Plaintiff's claims. Plaintiff filed Objections [20–1] to Magistrate Judge Strother's Report and Recommendation.

### I. FACTS

The facts of this case are outlined in detail in Magistrate Judge Strother's Report and Recommendation and the Court only summarizes them here.

Plaintiff is a certified nursing assistant at Defendants' nursing home facility in Lawrenceville, Georgia. For four to four and one half months, Plaintiff's supervisor was a licensed practical nurse named Sue Conners. According to Plaintiff, Conners uttered racial slurs and epithets on numerous occasions, made numerous derogatory comments, and engaged in several actions Plaintiff viewed as racially demeaning or derogatory. Plaintiff alleges that Conners' behavior created a hostile work environment that Defendants did not attempt to remedy.

Plaintiff also alleges that an individual episode involving one of Defendants' patients evidences a hostile work environment. The patient requested that she not receive any care from any black males. In response to the patient's request, Defendants directed that a "post-it" note be placed on a monthly flow sheet directing that "no black males" care for this particular patient. Plaintiff acknowledges that this episode did not reflect any personal racial animus towards him or any other black male employee, but Plaintiff was offended by the note nonetheless.

### II. DISCUSSION

Plaintiff objects to Magistrate Judge Strother's Report and Recommendation on four grounds. Plaintiff contends that: (1) the Magistrate Judge did not have jurisdiction to rule on the parties' Motions for Summary Judgment, that his Report and Recommendation should be vacated and stricken from the record, and that this Court should review the parties' Motions for Summary Judgment "without deference to the Magistrate's improper and void recommendation," Pla. Brief, at 11; (2) assuming he had jurisdiction to consider the Motions, the Magistrate Judge improperly made factual determinations where questions of fact exist; (3) the Magistrate Judge failed to apply the proper legal principles; and (4) the Magistrate Judge did not view the facts in the light most favorable to Plaintiff in reviewing Defendants' Motion for Summary Judgment.

A. *The Magistrate Judge's Authority To Review Motions For Summary Judgment*

Plaintiff contends that Magistrate Judge Strother did not have jurisdiction to review the parties' Motions for Summary Judgment because the parties expressly did not consent to proceed before the Magistrate Judge. In support of his position, Plaintiff cites 28 U.S.C. § 636(b)(1)(A), which states:

[A] judge may designate a magistrate to hear and determine any pretrial matter before the court, *except a motion* for injunctive relief, for judgment on the pleadings, *for summary judgment*, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.

28 U.S.C. § 636(b)(1)(A) (emphasis supplied).[1]

---

1. Plaintiff also cites Local Rule 73.1(B)(1), formerly Local Rule 260–1(b)(1), which states as follows:

However, the very next subparagraph of § 636 states as follows:

[A] judge *may also designate a magistrate* to conduct hearings, including evidentiary hearings, and *to submit to a judge of the court proposed findings of fact and recommendations for the disposition,* by a judge of the court, on *any motion excepted in subparagraph (A ).* . . .

28 U.S.C. § 636(b)(1)(B) (emphasis supplied). Read as a whole, § 636 permits a district judge to designate a magistrate judge to rule on any pre-trial motion save for those excepted in § 636(b)(1)(A). Regarding those motions excepted in § 636(b)(1)(A), a magistrate judge cannot issue a dispositive ruling on any of these motions without express consent from the parties, but a magistrate judge can issue proposed findings of fact and recommendations for the disposition of any of these motions. *See* 28 U.S.C. § 636(b)(1)(B).

When this case was filed, it was referred or designated to Magistrate Judge Strother pursuant to Rule 920–2(a) of the Internal Operating Procedures of this Court. Pursuant to this reference or designation, Magistrate Judge Strother heard and determined all of the non-dispositive pre-trial matters in this case. Further, Magistrate Judge Strother considered the dispositive motions in this case, i.e., the parties' Motions for Summary Judgment, and entered proposed findings of fact and recommendations for the disposition of these motions. Thus, Magistrate Judge Strother's issuing his Report and Recommendation on the parties' Motions for Summary Judgment complied with both the spirit and the letter of § 636(b)(1)(B) and Rule 920–2(a) of the Internal Operating Procedures of this Court.

For these reasons, the Court **DENIES** Plaintiff's request to vacate Magistrate Judge Strother's Report and Recommendation and to strike it from the record. Magistrate Judge Strother's Report and Recommendation was entered properly and is not, as Plaintiff characterizes it, "void." The Court reviews *de novo* those portions of Magistrate Judge Strother's Report and Recommendation to which Plaintiff specifically objects. *See* 28 U.S.C. § 636(b)(1)(C). Further, contrary to Plaintiff's arguments, those portions of Magistrate Judge Strother's Report and Recommendation to which Plaintiff does not specifically object are entitled to deference. *Id.;* Fed.R.Civ.P. 72(b) & advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").

Concurrently with the filing of a complaint in a civil case, the clerk shall notify the plaintiff or plaintiffs of the opportunity to consent to have the case heard, determined, and final judgment on the case entered by a magistrate judge. The notice shall be service with the complaint upon all other parties. . . .

LR 73.1(B)(1) NDGa. Plaintiff contends that the parties did not consent to proceed before the Magistrate Judge as contemplated by Local Rule 73.1(b)(1). However, the Court directs Plaintiff's attention to Local Rule 72.1(B), which states:

A magistrate judge shall promptly conduct any such proceedings as may be required in connection with a dispositive pretrial motion referred to the magistrate judge by a district judge. Objections to the magistrate judge's recommendation for disposition shall be processed in accordance with Fed.R.Civ.P. 72(b). A listing of dispositive motions is contained in 28 U.S.C. § 636(b)(1).

LR 72.1(B) NDGa (formerly LR 260–2(b) NDGa).

The Court also directs Plaintiff's attention to Rule 920–2 of the Internal Operating Procedures for the Northern District of Georgia, which states:

All cases brought in the Atlanta and Newnan Divisions pursuant to 42 U.S.C. § 2000e–2 (Title VII of the Civil Rights Act of 1964) shall be referred at the time of filing to the full time magistrates under the authority of 42 U.S.C. § 20003–5(f)(5) who shall, acting as special masters, hear and decide such cases in their entirety. . . . Where there are additional causes of action arising under federal or state law in a referred case, such action shall also be referred to the magistrates, under Rule 53 of the Federal Rules of Civil Procedure *if the parties do not consent to the trial of such issues by the magistrate* . . . .

Internal Operating Procedures Rule 920–2(a) (emphasis supplied). Rule 920–2 is consistent with the provisions of 42 U.S.C. § 2000e *et seq.,* and has been upheld expressly as authorized under the law and constitutional. *See Parker v. Dole,* 668 F.Supp. 1563 (N.D.Ga.1987); *see also Kinney v. Motion Indus., Inc.,* No. 1:94–CV–1317–FMH (N.D. Ga. June 22, 1995), *petition for mandamus denied,* No. 95–8859 (11th Cir. July 21, 1995); *Richardson v. Bedford Place Hous. Phase I Assocs.,* 855 F.Supp. 366 (N.D.Ga.1994).

### B. Plaintiff's Hostile Work Environment Claim

To state a claim for hostile work environment harassment, Plaintiff must show that he was subject to a workplace "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir.1995). Plaintiff must show that the discriminatory atmosphere was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371 (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405); *Edwards,* 49 F.3d at 1521.

It is not sufficient that Plaintiff merely highlight a couple of utterances of racial epithets as evidence of a hostile work environment. *See Harris,* 510 U.S. at 21, 114 S.Ct. at 370 ("As we pointed out in *Meritor,* mere utterance of an . . . epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII." (internal quotation marks omitted)). Racial slurs must be "so common place, overt and denigrating that they created an atmosphere charged with racial hostility." *Edwards,* 49 F.3d at 1521 (quoting *EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 (11th Cir.1990)).[2]

In *Harris,* the Supreme Court enunciated four factors to be considered in determining whether a plaintiff establishes a *prima facie* case of a hostile work environment: (1) the frequency of the discriminatory conduct; (2) the severity of the discriminatory conduct; (3) whether the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the discriminatory conduct unreasonably interferes with an employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

If the plaintiff establishes a *prima facie* case, the plaintiff then must show that the employer is liable for the hostile working environment. The plaintiff must show that the employer "knew or should have known of the harassment and failed to take prompt reasonable action against the [harassing employee]." *Steele v. Offshore Shipbuilding. Inc.,* 867 F.2d 1311, 1316, *reh'g, denied,* 874 F.2d 821 (11th Cir.1989); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982); *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 957 (N.D.Ga. 1995), *aff'd,* 87 F.3d 1331 (11th Cir.1996).

To determine whether Defendant is entitled to summary judgment on Plaintiff's claims, the Court must apply these principles to the facts discerned from the evidence in this record. In viewing the evidence, the Court avoids making credibility determinations and views the evidence in the light most

---

**2.** Plaintiff cites *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993), for the proposition that the use of a racial slur on a couple of occasions is sufficient to state a claim for hostile work environment harassment. Plaintiff's reliance on *Rodgers* is misplaced. First, the court in *Rodgers* did not rely solely on the racial slurs in determining that a hostile work environment existed, but rather concluded that the fact that a supervisor had uttered racial slurs supported the plaintiff's hostile work environment claim. *Id.* The court also emphasized other statements and actions by the plaintiff's supervisor that the plaintiff considered racist and held, after viewing the totality of the circumstances, that the plaintiff presented sufficient evidence from which a fact finder could find that the plaintiff's work environment was hostile. *Id.* at 675–76.

Second, to the extent *Rodgers* holds that the use of a racial slur on a couple of occasions is

sufficient to create a hostile work environment, this Court notes the *Rodgers* opinion does not even cite the Supreme Court's then-six week old opinion in *Harris,* which clarified the standard for determining when hostile work environment exists and in which the Court re-affirmed its position in *Meritor* that the mere utterance of a racial epithet that engenders offensive feelings in an employee is insufficient to create a hostile work environment. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370; *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06.

Finally, to the extent that Plaintiff's reading of *Rodgers* is correct, *Rodgers* appears to be at odds with the Eleventh Circuit's decisions in *Wallace, Beverage Canners,* and *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982). The Court does note, however, that *Rodgers* involves the use of racial slurs by an employee's supervisor and that *Wallace, Beverage Canners,* and *Henson* do not.

favorable to Plaintiff. Plaintiff objects that Magistrate Judge Strother made improper credibility determinations and failed to view the evidence in the light most favorable to Plaintiff. The Court first addresses these objections and then turns to the question whether Plaintiff presents sufficient evidence to create jury issues on his hostile work environment claim.

### 1. *The "Mooly" Comment*

■ Plaintiff's first objection to Magistrate Judge Strother's recommendation regarding Plaintiff's hostile work environment claim centers on the Magistrate Judge's determination that the term "mooly" was not, on its face, a racially derogatory term. Plaintiff's supervisor Conners used the term in reference to Plaintiff and in the presence of Plaintiff and four witnesses, stating "all that mooly can do is make coffee and bring it to me." (Chappell dep. at 31.) Plaintiff contends that the Magistrate Judge's finding that "mooly" was not, on its face, a racially derogatory term failed to look at the evidence in a light most favorable to Plaintiff. According to Plaintiff, the Magistrate Judge, in essence, made an improper credibility determination.

Plaintiff's Objection is without merit. The Magistrate Judge did state that "mooly" is not, on its face, racially derogatory term. Notwithstanding this statement, however, the Magistrate Judge assumed that "mooly" was a racially derogatory term and further accepted that Conners used the term in a racially derogatory manner and that Plaintiff considered the term racially derogatory. Thus, the Magistrate Judge did not make any credibility determination adverse to Plaintiff. If anything, the Magistrate Judge made a credibility determination in favor of Plaintiff. In sum, the Magistrate Judge did not make any improper credibility determination or view any evidence in a light not favorable to Plaintiff in stating that "mooly" was not, on its face, a racially derogatory term.

### 2. *Plaintiff's Altered Journal Entries*

■ Plaintiff next objects to the Magistrate Judge's noting that Plaintiff altered certain entries in his daily journal. Plaintiff relies on some of these altered journal entries in support of his hostile work environment claim. Plaintiff contends that the Magistrate Judge made credibility determinations and failed to look at the evidence in the light most favorable to Plaintiff by noting that Plaintiff altered some journal entries. This is not so. The evidence shows, without dispute, that Plaintiff altered some of his journal entries. Indeed, Plaintiff admits in his deposition that he altered many of his journal entries. Thus, the Magistrate Judge merely reported what the evidence showed and did not make any improper credibility determination. For example, the Magistrate Judge did not discredit the altered entries in Plaintiff's journal and did not give more weight to Defendant's evidence because of Plaintiff's altered journal entries. Further, the Court notes in looking at the evidence in the light most favorable to Plaintiff, the Magistrate Judge is not required to ignore evidence adverse to Plaintiff's position and consider only evidence which supports Plaintiff's position. Rather, the Magistrate Judge must look at the evidence, draw all reasonable inferences favorable to Plaintiff's position, and resolve any conflicts in the evidence in favor of Plaintiff. The Magistrate Judge did all of these things. Plaintiff's Objection is without merit.

### 3. *Application of the Hostile Environment Standard*

■ Finally, Plaintiff contends that the Magistrate Judge failed to apply the proper standard to determine whether Plaintiff presents sufficient evidence to submit his hostile work environment claim to a jury. Plaintiff argues that the Magistrate Judge looked at specific episodes of discrimination in isolation instead of looking at all the circumstances as a whole and thus failed to consider whether Plaintiff's workplace, as a whole, was permeated with discriminatory intimidation, ridicule, and insult.

In support of his *prima facie* case of a hostile work environment, Plaintiff relies on: (1) the "mooly" statement above and the facts that, shortly thereafter, Conners made Plaintiff go to her car and get her cigarettes

on one occasion and also made Plaintiff go get her meal tray on several occasions in the span of one week; (2) Conners's statements, *outside Plaintiff's presence,* that (a) "these goddamn Georgia niggers think they own Georgia," (Williams aff. at 4) (b) that "where I come from niggers knew their place," (Wright aff. at 3) and (c) that one worker who sang while she worked sounded like a slave on the plantation; (3) Defendants' placing a post-it note on a flow chart directing that no black males care for a specific patient, as per that patient's request; and (4) Defendants' altering, temporarily in some cases, Plaintiff's duties and work shift.[3]

■ For the reasons stated in Magistrate Judge Strother's Report and Recommendation, this Court finds that these episodes neither individually nor collectively are so severe as to alter the conditions of employment. Thus, Defendants are entitled to summary judgment. However, even assuming *arguendo* that certain of the above episodes—namely the collective episodes involving Conners—were sufficient to create a hostile work environment, Defendants still are entitled to summary judgment because Plaintiff fails to present sufficient evidence to create a jury issue whether Defendants had notice of the hostile work environment and failed to take prompt remedial action.

■ To prove that an employer is indirectly liable for hostile work environment, an employee must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Kilgore v. Thompson & Brock Management. Inc.,* 93 F.3d 752, 753 (11th Cir. 1996); *Henson v. City of Dundee,* 682 F.2d 897, 905 (11th Cir.1982). "The employee can show that the employer had knowledge of the harassment by proving that he complained to *higher management* of the problem or by demonstrating that the harassment was so

pervasive that an inference of constructive knowledge arises." *Kilgore,* 93 F.3d at 753–54 (emphasis supplied); *see also Reynolds v. CSX Transp., Inc.,* 115 F.3d 860, 866–67 (citing *Kilgore* for the proposition that a hostile work environment complaint to a manager not considered "higher management" does not suffice as notice to company); *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir.1988); *Henson,* 682 F.2d at 905.

### a. *Most of the alleged episodes of harassment were never reported*

The alleged harassment here was not so pervasive as to permit an inference of constructive knowledge on the part of Defendants. Most of the episodes to which Plaintiff cites in support of his hostile work environment claim (and all of the events that have any overt racial element) involve statements or actions by one person—Conners. Plaintiff claims that Conners' statements and actions created a hostile work environment and that Defendants did nothing to remedy the situation. Plaintiff does not, and cannot, argue that Conners' harassment was so pervasive as to permit an inference of constructive knowledge. Indeed, there were only four to five episodes involving Conners during the entire four and a half month period that Conners supervised Plaintiff. Therefore, to show that Defendants had knowledge of any alleged hostile work environment, Plaintiff must show that he complained to higher management about any alleged harassment. This is where Plaintiff's claim fails because most of the episodes involving Conners were never reported to anyone.

■ For example, Conners' statements about "niggers knowing their place" or about the worker who sounded like a "slave on the

---

3. Plaintiff also alleges that Conners inquired about the nature of Plaintiff's personal relationship with Linda Chappell, a white LPN (the same position held by Conners) at Defendants' facility. Conners allegedly stated that where she came from, races did not mix. Assuming this statement was made, it was not made in front of Plaintiff or Chappell, but rather was personal commentary for the benefit of those present. In

any event, this statement, which was made between July 10, 1995 and July 25, 1995, also was not reported to higher management until after Conners was reprimanded for the "mooly" incident. Tanner felt that since Conners' punishment for making the "mooly" statement postdated the above statement, no further punishment was necessary.

plantation" were never reported. Plaintiff also never reported that Conners made Plaintiff get her cigarettes on one occasion or that she made Plaintiff go get her meal tray several times over the course of approximately a week.[4] In fact, the only episodes involving patently offensive remarks that were reported were the "mooly" statement, which was reported to higher management on July 25, 1995, and the statement that "these goddamn Georgia niggers think they own Georgia," which was reported to higher management on August 4, 1995.[5]

### b. Defendants responded immediately to the episodes that were reported

Once the "mooly" statement was reported to higher management on July 25, 1995, Defendants officially investigated the incident and issued an official reprimand to Conners on July 28, 1995. Defendants also subsequently moved Conners to a different wing to minimize her contact with Plaintiff and others. The alleged statement about "these goddamn Georgia niggers" was discovered after Conners was reprimanded, during a follow-up investigation of the "mooly" incident.[6] Defendants investigated this alleged incident and determined that there was insufficient evidence to support the allegation because no one would verify that the comment had been made. Accordingly, Defendants did not issue any formal punishment for the alleged "goddamn Georgia niggers" statement.

In sum, while the two episodes of which Defendants had knowledge were alone insufficient to establish a claim of hostile work environment, *see Harris*, 510 U.S. at 23, 114 S.Ct. at 371, Defendants responded to and investigated the episodes of which they were aware and issued punishments where they found the episodes probably occurred. Interestingly, in punishing Conners for the "mooly" statement, Defendants apparently effectively responded to the episodes of which Defendants were not aware. This is

4. Plaintiff argues that harassment by supervisors is imputed to the employer and thus Plaintiff was not required to report any of Conners' statements or actions in order to hold Defendants liable on his hostile work environment claim. However, as the Eleventh Circuit recently re-iterated in *Faragher v. City of Boca Raton*, 111 F.3d 1530 (11th Cir.1997), a supervisor's actions are imputed to the employer only where the supervisor either is acting within the scope of her employment or was aided in her harassment by authority given her by the employer. *Id.* at 1536; *see also Sparks v. Pilot Freight Carriers. Inc.*, 830 F.2d 1554, 1558–60 (11th Cir.1987). As a general matter, harassing activity is not within the scope of a supervisor's employment because the supervisor generally is attempting to achieve some personal end as opposed to some purpose authorized by the employer. *Id.* at 1536 ("[A]n agent is not acting within the scope of his employment when he is 'going on a frolic of his own'.... In this scenario, the agent steps outside of his employment ... to further some personal end ...."). Further, a supervisor generally is not aided by the authority given her by the employer unless, for example, the supervisor held it over the plaintiff's head that the supervisor had authority to fire the plaintiff if the plaintiff did not do as the supervisor wished. *Id.* at 1537.

Here, Plaintiff fails to present any evidence that Conners acted within the scope of her authority or that Conner was aided by her authority in harassing Plaintiff. *See Faragher*, 111 F.3d at 1537 ("In one sense, a supervisor is always aided in accomplishing hostile environment ... by the existence of an agency relationship with his employer. However, the common law rule does not use 'aided' is such a broad sense."). Accordingly, Plaintiff must show that Defendants are directly. as opposed to indirectly or vicariously, liable on his hostile work environment claim.

5. Notably, Plaintiff was not the person who reported the "mooly" incident. Plaintiff relied on Chappell to report the incident.

6. Normally, complaints of discrimination were made to Pat Tanner, the administrator of the facility at which Plaintiff works. However, Tanner was on vacation at the time the "mooly" incident was reported to higher management. Therefore, the administrator that handled Plaintiff's complaint was Ken Freeman, who was acting administrator in Tanner's absence. Freeman was the administrator who issued the formal reprimand to Conners on July 28, 1995.

When Tanner returned to work on July 31, 1995, she initiated her own investigation. During this second investigation, Tanner learned about the alleged statement by Conners that "these goddamn Georgia niggers think they own Georgia." However, in her deposition, Tanner testifies that no one would verify that this statement had been made. Tanner concluded that Freeman's reprimanding Conners for the "mooly" statement was appropriate and further determined that no further punishment was warranted for Conners' "goddamn Georgia niggers" comment because there was insufficient evidence that the comment had been made.

so because assuming *arguendo* that all of these events occurred, they all, with the possible exception of one, occurred prior to the time Conners was punished for the "mooly" statement.

The evidence shows that: (a) the "mooly" statement was made on June 28, 1995; (b) the statement that "these goddamn Georgia niggers think they own Georgia" was made sometime between July 10, 1995 and July 25, 1995; and (c) the statement about "niggers knowing their place" was made in June 1995. Further, Conners' requesting Plaintiff to get her cigarettes and to get her meal tray occurred right after the "mooly" statement. There is no indication about when Conners' statement about one employee sounding like a "slave on the plantation" was made.

In other words, there is no evidence that Plaintiff had any problems with Conners subsequent to Conners' being reprimanded for the "mooly" statement. Indeed, Plaintiff's only complaint about Conners after she was reprimanded is that she still supervised him for approximately one month after the "mooly" incident. *Compare Reynolds,* 115 F.3d at 867–68 ("Reynolds herself testified that after CSXT took action against Widney, he never again said anything to her or touched her inappropriately. A reasonable juror could not find … that the acts taken by CSXT … did not constitute prompt action 'reasonably likely to prevent the conduct from recurring.' "); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989) ("Of special importance, [the defendant's] harassment stopped after the remedial action."); *see also McKenzie v. Illinois Dep't of Transp.,* 92 F.3d 473, 481 (7th Cir.1996) ("[M]oreover, [the defendant's prompt remedial action] was completely effective."). In October 1995, Conners left Defendants' employ.

### c. *Defendants' response was prompt and reasonable*

Despite the fact that Defendants responded to Plaintiff's complaint and reprimanded Conners, Plaintiff still claims that Defendants condoned a hostile work environment because their remedial response was neither prompt nor reasonable. Plaintiff's "promptness" argument is based on the fact that Defendants did not punish Conners until one month after the alleged "mooly" incident occurred. Plaintiff alleges that the "mooly" statement was reported to Director of Nursing Judy Jackson on the same night it occurred. In her deposition, Jackson testifies that she never reported the incident to higher management because she never understood the statement's being reported to her to be an official complaint.

While there may be some question as to whether the "mooly" incident's being reported to Jackson should have been considered an official complaint that Jackson should have reported to higher management, there is no evidence that Defendants coerced Jackson, generally or in this instance, not to report complaints of discrimination or hindered Jackson's ability to report complaints. There is also no evidence that Jackson herself was motivated by some discriminatory motive in not reporting the "mooly" incident to higher management. In other words, Defendants in no way caused the delay in the incident's being reported to higher management. In any event, whatever the reasons for Jackson's not reporting the incident, it is undisputed, in the final analysis, that neither Plaintiff nor any other employee reported the statement to management until July 25, 1995, after Plaintiff filed a formal complaint with the EEOC. Plaintiff fails to present any evidence that anyone in higher management knew about the "mooly" statement prior to July 25, 1995. Considering this, no reasonable juror could find that Defendant's investigation of the "mooly" incident, which began on July 25, 1995, and Defendant's reprimanding Conners three days later was not reasonably prompt.

Plaintiff next argues that Defendant's punishment of Conners was not reasonable. According to Plaintiff, Conners should have been punished for a Category I violation, which Plaintiff alleges applies to the use of a racial epithet.[7] A Category I violation re-

---

**7.** According to Defendants, a Category I violation is for unlawful harassment, as opposed to only

the uttering of a racial slur or epithet.

quires immediate suspension pending investigation and termination upon verification that the violation occurred. Instead, Conners was punished for a Category II violation for failing to respect others. Plaintiff alleges that Defendants failed to follow their own written policies in not punishing Conners for a Category I violation and that such shows that Defendants condoned a hostile work environment. This Court disagrees.

■ While terminating Conners clearly would have been an effective response to Plaintiff's allegations, and even assuming *arguendo* all of Plaintiff's allegations were true, Title VII does not per se require employers to terminate employees who allegedly contribute to a hostile work environment. *Cf. Reynolds,* 115 F.3d 860, 867–68 (11th Cir. 1997) ("What is appropriate remedial action will necessarily depend on the particular facts of the case. . . ."); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 536 (7th Cir. 1993) ("No doubt . . . [the defendant] could have done more to remedy the adverse effects of [the harasser's] conduct. But Title VII only requires that the employer take steps reasonably likely to stop the harassment."). An employer must only take measures reasonably calculated to remedy any allegedly offending situation. *Reynolds,* 115 F.3d at 867–68; *Virgo v. Riviera Beach Assocs.,* 30 F.3d 1350, 1363 n. 9 (11th Cir.1994); *Steele,* 867 F.2d at 1316; *Huddleston,* 845 F.2d at 904; *Henson,* 682 F.2d at 905; *see also McKenzie,* 92 F.3d at 480.

Defendants investigated the two episodes concerning Conners about which Plaintiff and others complained and reprimanded Conners for the statement Defendants' investigation determined she had made. Notably, neither Plaintiff nor any other employee complained about any statement or action involving Conners subsequent to her reprimand. *See*

*Reynolds,* 115 F.3d at 867–68; *Steele,* 867 F.2d at 1316; *see also McKenzie,* 92 F.3d at 481 ("[M]oreover, [the defendant's prompt remedial action] was completely effective.").

For the foregoing reasons, the Court finds that Plaintiff fails to present sufficient evidence that Defendants failed to promptly and reasonably respond to Plaintiff's and others' complaints about Conners.[8]

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claim.

### C. *Plaintiff's Retaliation Claim*

In his Report and Recommendation, Magistrate Judge Strother noted that Plaintiff did not appear to respond to Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim and that Plaintiff did not move for summary judgment on this claim. However, Magistrate Judge Strother reviewed Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim because it was not completely clear that Plaintiff had abandoned the claim. In his Objections to Magistrate Judge Strother's Report and Recommendation, Plaintiff does not specifically object to any portion of Magistrate Judge Strother's analysis of his retaliation claims. Accordingly, the Court reviews Magistrate Judge Strother's Report and Recommendation regarding Plaintiff's retaliation claim for clear error.

In so doing, the Court finds that Magistrate Judge Strother committed no clear error in his analysis and recommended resolution of Plaintiff's retaliation claim. Indeed, the Court finds that Magistrate Judge Strother's Report and Recommendation is correct in all material respects regarding Plaintiff's retaliation claims and **ADOPTS** that portion of Magistrate Judge Strother's

---

8. Regarding Plaintiff's allegations about Defendants' altering his duties and changing his shifts, these events do not support Plaintiff's hostile work environment claim for the reasons stated in Magistrate Judge Strother's Report and Recommendation—essentially, that there is no evidence that these events were based on Plaintiff's race or any alleged insensitivity to how Plaintiff felt he was being treated based on his race. Further, Defendants returned Plaintiff's shift and duties to the status quo as soon as Plaintiff complained

about the alterations. Plaintiff admits that he does not know why the alterations were ever made, and even testifies that, on one occasion, he felt that he was not transferred to a new shift because he filed this lawsuit.

As for the "no black males" post-it note, Defendants were merely complying with the wishes of one of their patients. Plaintiff admits that he does not think that Defendants coerced the patient into issuing that instruction.

Report and Recommendation as the **ORDER** of the Court. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim.

**D.** *Plaintiff's Motion For Summary Judgment*

Plaintiff also does not make any specific objections regarding the Magistrate Judge's recommendation that this Court deny Plaintiff's Motion for Summary Judgment. Rather, Plaintiff makes only one passing reference to Defendant's admitting that "mooly" was a racially derogatory term. Plaintiff contends that Defendant's admission supports a finding of that Plaintiff is entitled to summary judgment on his hostile work environment claims. The Court disagrees. Even assuming *arguendo* Defendant admitted that "mooly" was a racially derogatory term, such would not entitle Plaintiff to judgment as a matter of law.

The Court finds that Magistrate Judge Strother's Report and Recommendation is correct in all material respects regarding Plaintiff's Motion for Summary Judgment and the Court **ADOPTS** that portion of Magistrate Judge Strother's Report and Recommendation as the **ORDER** of the Court. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment.

## III. *CONCLUSION*

For the foregoing reasons, the Court **ADOPTS** Magistrate Judge Strother's Report and Recommendation [19–1] as the **ORDER** of the Court regarding Plaintiff's Motion for Summary Judgment on his hostile work environment claims and regarding Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment [11–1] and **GRANTS** Defendants' Motion for Summary Judgment [10–1] on Plaintiff's retaliation claim. The Court also **ADOPTS** Magistrate Judge Strother's analysis regarding Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claim. For the reasons stated therein as well as the reasons stated in this Court's Order, the Court **GRANTS** Defendants' Motion for Summary Judgment [10–1] on Plaintiff's hostile work environment claim.

The Court directs the Clerk to enter final judgment in favor of Defendants on all of Plaintiff's claims.

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

May 7, 1997

STROTHER, United States Magistrate Judge.

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Local Rules 260 and 500. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of the receipt of this order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay,* 714 F.2d 1093 (11th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

## ATTACHMENT

## ORDER AND REPORT AND RECOMMENDATION

May 7, 1997

The plaintiff, an African–American male, filed this action alleging that he was sub-

jected to a hostile environment based on racial harassment by his supervisor, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a. The action is currently before the undersigned on the defendants' Motion for Summary Judgment (10) and the plaintiff's Motion for Summary Judgment (11). Also before the undersigned is the defendants' Motion to Exceed the Page Limit.(15).

## PAGE LIMIT

The Motion to Exceed the Page Limit is GRANTED. (15).

## SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) provides that summary judgment shall be rendered if "there is no genuine issue as to a material fact and [if] the moving party is entitled to judgment as a matter of law." *See, Young v. General Foods Corp.*, 840 F.2d 825 (11th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other factors immaterial.

*Id., quoting, Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Where the evidence is merely colorable or is not significantly probative, summary judgment is appropriate. *Id., citing, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether the moving party has demonstrated that a genuine issue

exists in the case, the court reviews the evidence and all facts in the case in the light most favorable to the party opposing the motion. *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637 (11th Cir.1984). If the party seeking summary judgment meets the initial burden of demonstrating that there is no genuine issue of material fact, the burden then shifts to the non-moving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). A non-moving party opposing a summary judgment motion which is supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. *Id.* Furthermore, the evidence cannot consist of conclusory allegations or legal conclusions. *Id.*

Courts recognize that in a discrimination case, the employer's true motivation is particularly hard to ascertain. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993). In order to establish pretext, a plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case. *Id.* at 921.

> Evidence already introduced to establish the prima facie case may be considered, and '[i]ndeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation' and establish pretext. [citation omitted] Accordingly, the grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a prima facie case because of the 'elusive factual question' of intentional discrimination. [citation omitted]

*Id.* at 921.

The defendants maintain that the plaintiff has not established a hostile environment. To prove a case of hostile environment due to his race, the plaintiff must show that the

actions by the defendants "altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." *Edwards v. Wallace Community College*, 49 F.3d 1517 (11th Cir.1995). To rise to the level of a hostile atmosphere, the workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The racial slurs allegedly made by co-workers must be so " 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.' " *Edwards*, 49 F.3d at 1521, *quoting, E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990). Factors to be considered in determining if a hostile environment was created are the frequency or the discriminatory conduct, whether the conduct was humiliating or threatening, and whether it unreasonably interfered with the plaintiff's performance at work. *Id., quoting, Harris*, 510 U.S. at 24–26, 114 S.Ct. at 372. A plaintiff may have a viable hostile environment case even if the remarks were not directed at him. *Id.* The plaintiff must subjectively view the conduct as hostile. *Id.* Finally, the incidents may not be mere speculation by the plaintiff. *See, Id.*

The facts, taken in a light most favorable to the plaintiff indicate that the plaintiff began work for the defendants in July, 1991, as a certified nursing assistant. (Smith Depo. 20–21). Sue Conners is a licensed practical nurse who was the plaintiff's superior between May, 1995 and October, 1995. (Smith Depo. 116; Tanner Depo. 11). Conners was employed at the facility for only four to four and one-half months. (Tanner Depo. 12).[1] On June 28, 1995, Ms. Conners, a white female, stated in front of the plaintiff and four others, in reference to the plaintiff, that "all that mooly can do is make coffee and bring it to me." (Smith Depo. 54–56; Chappell Depo. 31; Wright Aff.; Williams Aff.; Finley Aff).[2] Smith viewed this as a racial slur meaning savage, based on his previous experience in hearing the word while in the Navy. (Smith Depo. 56–57). Tanner, the facility administrator who later investigated the incident determined that it had the appearance or connotation of a slur. (Tanner Depo. 23, 106).

Chappell reported the incident to her supervisor, the Director of Nursing, Jackson, as Jackson was leaving. (Chappell Depo. 34; Smith Depo. 58; Jackson Depo. 22). Chappell also reported the incident to Unit Manager, Marlow. (Chappell Depo. 40). Smith did not report the incident to Jackson because he knew that Chappell had talked to her. (Smith Depo. 58–59). Tanner, the Administrator, who later investigated the incident, was on vacation at the time of the incident and did not learn of it until several months later. (Tanner Depo. 9). When questioned about the reporting of the incident Jackson could not recall that anything specifically racial was reported and could not remember the actual contents of Chappell's notification to her. (Tanner Depo. 31–32).

1. The undersigned notes that certified copies of Tanner's, Jackson's and Conners' depositions were filed with the court. These depositions do not appear to be the original depositions and were not sealed. The court has used these depositions. However, the plaintiff's counsel should have filed the originals are required by Local Rule 225–3.

2. Conners testified at her deposition that she had not used the term, had never heard the term and did not know what it meant. (Conners Depo. 27–30, 35). She maintained that Chappell was at the heart of the matter and wanted Conners terminated, and the four other individuals who maintained they heard the statement merely followed Chappell's lead. (Conners Depo. 41, 62). She stated that she may have asked Smith to get her cigarettes because he had the key to the front door and that she did not recall asking him to get her dinner trays, because she did not like or usually eat the meals at the center. (*Id.* 55). She did not discuss Smith and Chappell's relationship. (*Id.* 54) and did not make fun of the CNA who sang or say she sounded like a plantation slave. (*Id.* 56). She did not tell the white, male nursing assistant that if there was something he did not want to do, to have one of the black CNA's do it. (*Id.* 57). She never used the term "nigger" at work and did not ever say "goddamn Georgia niggers." (*Id.* 57). She was only counseled for the "mooly" incident and not other incidents. (*Id.*; See, Depo. Exhs. 1–4). She wrote a letter commending Smith for his work at the center. (Conners Depo. Exh. 5).

Tanner interviewed people about the incident as soon as she returned to work and heard about it and made an investigation on why nothing had been done. She did believe that it would have been better if Smith had told someone himself or reported it himself, as the policies required. (Tanner Depo. 36–42).

Smith also asserts that on June 29, 1995, Ms. Conners made him go to her truck and bring her back her cigarettes. She also made him go get her meal tray for her on the same night. (Smith Depo. 59–60). She made Smith go get her meal tray several nights, while a white CNA was never asked to do so. (Smith Depo. 63; Chappell Depo. 38). At one point Smith was told by another CNA that Conner had been asking about the plaintiff's relationship with Chappell, whom he lived with or had a common law marriage with. The CNA told Smith that Conners indicated that blacks and whites should not mix and that she had never had one in her house and neither had her mother. (Smith Depo. 60, 65). Smith did not actually hear the statements by Conners. (Id.). He also heard from another nurse that Conners was talking to Jackson and Doster about his relationship with Chappell. (Smith Depo. 64).

Smith was told by another employee that Conners indicated that if there was anything that the white employee did not want to do, she would have a black employee do it. (Smith Depo. 68). Smith did not hear the conversation himself. (Id). He was also told by two other employees that Conners had stated "These goddamn Georgia niggers think they run everything." (Smith Depo. 74–75). Smith did not hear Conners make the statement. (Id).

At some point all of the CNAs, including all of the white females and one black female, were tired of Conner's and were hostile towards her and Smith believed they would physically attack Conners eventually. (Smith Depo. 69).

In July, Chappell asked Jackson what she was going to do about Conners. This conversation took place in the context of a conflict between two other employees. Jackson indicated that she was going to replace Con-

ners. (Chappell Depo. 39–40). In late July, 1995, Chappell again states that she talked to Jackson and asked if there was an investigation of the incident. Jackson had no recollection of the incident and was upset when reminded of it. (Chappell Depo. 44, 54). Jackson did not tell Freeman, the acting Administrator, or Tanner, the Administrator, of the incident and did not recall the specifics of it. (Tanner Depo. 30–32). Chappell informed Jackson that an EEOC charge had been filed. (Id. 43–44). Chappell then went to the corporate personnel department and spoke with Harwell, and was told to go to the acting Administrator, Freeman. (Chappell Depo. 46–50; Tanner Depo. 28–29). Smith was not present during these conversations with Jackson or Freeman. (Smith Depo. 68). Tanner, the Administrator who was on vacation when the incident occurred, began an investigation upon her return from vacation when she learned of the incident. (Chappell Depo. 49–51, Tanner Dep. 30–34).

On August 3, 1995, Plaintiff was asked by Jackson to change from the A wing to B wing and from the 3:00 to 11:00 p.m. shift to a 7:00 a.m. to 3:00 p.m. shift. (Smith Tr. 77–78). He refused to move. (Id). He later discovered that all persons had been asked to change shifts. (Id). He was told by another employee that she understood that if he and Chappell did not change shifts they would be fired. (Smith Depo. 81). He did not change shifts and he was not fired. (Id). Smith indicated that it was possible that he had told Ms. Chen at the EEOC that Conners harassed everyone no matter what their race. (Smith Depo. 124).

On July 28, 1996, Conners was disciplined for a Category II violation with a written reprimand for failure to respect others, instead of a Category I violation, which requires suspension and termination if the allegation is verified. (Tanner Depo. 108–09). She was not disciplined for any statement other than the "mooly" statement and there is no indication that any of the other statements were reported to Tanner or an investigation sought at that time. (Tanner Depo. 44). Tanner believed that the statement was an inappropriate comment. She took at face value Smith's statement that he believed it

was a racial slur. (*Id*). After the discipline, the plaintiff maintains that Conners still supervised him for approximately one month. (Smith Depo. 116).

On August 4, 1995, three female employees went to Tanner to complain of Conners' statement about "goddamn Georgia niggers." The plaintiff was not present at the meeting. (Smith Depo. 79). He states that Tanner later told Chappell that Conners would be working on A wing in the weekends and that everyone was to be nice to her. (Smith Depo. 79).

Tanner made an investigation of the incident involving the "mooly" comment to make a response to the EEOC charge. During the investigation she learned of the other comments allegedly made by Conners, though they did not involve racially derogatory remarks. (Tanner Depo. 78, 82, 102–03).

On August 25, 1995, Plaintiff was told by Alice Hunter that she was now to do the plaintiff's schedules for him. (Smith Depo. 87–88). The Unit Manager who Hunter indicated had made the decision and Hunter were both black. (Smith Depo. 88). At that point Smith heard from other employees that he was no longer Unit Leader, but was never told this by the Unit Manager, who refused to discuss the issue with him. (Smith Depo. 89–90). He continued to perform some Unit Manager duties, but did not perform scheduling and some of the other duties of the position. (Smith Depo. 90–99). No one in nursing or the administration ever told him he no longer had the Unit Leader position. (Smith Depo. 106). The duty of making out the schedule was then restored to him, but he refused to perform it because he felt he was not restored to the Unit Leader position in a public manner and he was hurt that it had been taken away at all. (Smith Depo. 100–103). Tanner believed that the plaintiff was still the Unit Leader and that the position had never been removed from the plaintiff. (Smith Depo. 105). The plaintiff did not believe that Marlow acted out of retaliation for his discrimination charge and was

unsure of why she acted as she did. (Smith Depo. Vol. 2, 177).

On January 25, 1996, he was told that he would be moved to B wing on January 31, 1996. He believed it was for cross-training. However, he was not moved, while everyone else was. He believed it was due to his law suit that he was not moved. (Smith Depo. 108).[3] On February 15, all persons on his shift went to B wing except for him. (Smith Depo. 109).

On February 19, 1996, a note was posted indicating that a patient, Willie Mae Howell, did not want any black males caring for her at any time. (Smith Dep. 109). He did not believe that management coerced Howell to make the decision. (Smith Depo. 110; Tanner Depo. 115). The action did not result in any loss of pay or hours for the plaintiff. (Smith Depo. 111). Howell needed help bathing and in going to the restroom. (Tanner Depo. 128). If the center had not acceded to her wishes, then Howell could have reported this to the state that her resident rights were being violated in that she was not being given the personnel choice she had made. An investigation by the state would have resulted. (Tanner Depo. 128–29). There were other black CNA's on the wing at the time and none had filed a complaint to Tanner's knowledge. (Tanner Depo. 130). Howell's family indicated a bad experience in her past and that was why she did not want any black males caring for her. (Tanner Depo. 133). She was only in the facility for two to three months. (*Id*).

The plaintiff was transferred to B wing on May 15, 1996, and transferred back to A wing on June 1, 1996. He contends that at that time Chappell had been dismissed and that Marlow had indicated that if he moved back to A wing, he would be next. (Smith Depo. 111–112). The plaintiff was not fired and was on medical leave for two weeks for insomnia and depression at the time of the deposition. (Smith Depo. 112). He was to return to work on the 15th of June. (Smith Depo. 133).[4]

---

**3.** His complaint was filed in this court on January 29, 1996.

**4.** After the first deposition ended, the plaintiff's counsel provided two more versions of the plaintiff's journal, which the plaintiff indicated he had changed after the first version had been sent to

At the second deposition, the plaintiff indicated that Chappell told Jackson, after the incident on which he was called a mooly, something had happened that upset the plaintiff and not that there was a racial aspect to the incident. (Smith Depo. Vol. 2, 148–49).

He also changed an entry concerning a dispute between another employee and Marlow to hearing that three employees had been discussing his relationship with Chappell. (Smith Depo. Vol. 2, 150–51). He indicated that he learned that the conversation had occurred on the same day as the dispute between Marlow and the nurse. (Smith Depo., Vol. 2, 152).

On July 26, 1996, he added a statement that Jackson had come around to the floor and asked why no one was smiling. The plaintiff's entry was that he walked away because no one was doing anything about the discrimination against him. (Smith Depo. Vol. 2. 154). His altered version for July 29, 1995, indicated that Jackson had questioned employees concerning the possibility that Conners could have made the statements alleged and, though it was indicated she could have, that nothing was being done about it. (Smith Depo. Vol. 2, 156).

On an entry on June 6, 1995, the plaintiff added an indication that one of the nurses informed him that on a night when he was not at work, Conners asked the nurse about the plaintiff's relationship with Chappell. She indicated that Conners stated, "where I come from, niggers knew their place, he needs to know where his is." (Smith Depo. Vol. 2, 169–70). He also indicated that he wrote up a statement to that effect and put it under Jackson's door, along with other CNA's statements about Conners. (Smith Depo. Vol. 2, 171).

In his original June 22, entry, the plaintiff indicated that Conners made fun of a CNA who sang hymns while she worked and said she did not like working around her when she was singing. (Smith Depo. Vol. 2, 173).

In a later version, he indicated that Conners said the woman sounded like a "whining plantation worker." (Smith Depo. Vol. 2, 173).

Taken in a light most favorable to the plaintiff, the above facts indicate that he was told of certain statements allegedly made by Conners by other staff members, but was not present when the statements were made. He was present only when one statement was made, that calling him a mooly. This statement is not, on its face, a racially derogatory term, though, it is acknowledged that it was probably meant in a derogatory way. The plaintiff maintains that Conners also sent him to get her lunch tray and on one occasion, her cigarettes. Conners was apparently only at the facility for four to four and one-half months. The plaintiff has worked there for several years. Finally, he alleges that the action in indicating that no black males were to care for one woman at the center was racially harassing.

The only two instances which occurred in the plaintiff's presence during the time period in question were the "mooly" statement and the notice that one of the residents did not wish black males to care for her. The plaintiff only heard from other employees that the other statements were made by Conners. The "mooly" statement, even if considered a racially derogatory term, is no more than a mere utterance that engendered negative feelings, and does not rise to the level of a hostile work environment. The undersigned also finds that the unprovoked request by a resident of the center not to have black males in general care for her, while possibly not handled as well as it may have been, also does not rise to the level of a hostile environment case. There were no derogatory actions made against the plaintiff personally based on the indication and there is no indication that his employer caused the request of the resident. This only took place over two to three months while the woman was at the center. Thus, the undersigned finds that the plaintiff's allegations do not rise to the level of a hostile environment and

the EEOC. The first deposition had involved a previously provided version. (Smith Depo. Vol. 2, 138). Where there was a conflict, the plaintiff

indicated that the first version, which was sent to the EEOC, would be the more correct. (Smith Depo. Vol. 2, 168).

RECOMMENDS that the Defendants' Motion for Summary Judgment be GRANTED.

Based on the foregoing, IT IS FURTHER RECOMMENDED that the Motion for Summary Judgment by the plaintiff be DENIED.

### RETALIATION

The defendants also move for summary judgment as to the plaintiff's alleged claims of retaliation. The plaintiff has not addressed the motion as to retaliation and has not moved for summary judgment on such a claim. However, because the record is unclear, the court will address the defendant's motion. To establish a prima facie case of discrimination due to retaliation, the plaintiff must show: (1) that she engaged in a statutorily protected activity; (2) the employer took an adverse employment action against her; and (3) there is a causal connection between the two. *Meeks v. Computer Associates International*, 15 F.3d 1013 (11th Cir.1994); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598 (11th Cir.1986); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.) *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985). The plaintiff need not establish the sort of logical connection that would justify a prescription that the protected participation in fact prompted the action. *Simmons*, 757 F.2d at 1189. The third prong is satisfied by evidence that the protected action and the adverse employment action are not totally unrelated. *Meeks, supra; Bigge v. Albertsons, Inc.*, 894 F.2d 1497 (11th Cir.1990), *citing, Simmons*, 757 F.2d at 1189; *See, Weaver v. Casa Gallardo Inc.*, 922 F.2d 1515 (11th Cir. 1991). The expiration of a short time period between the protected activity and the adverse action alone does not necessarily provide such a link. *See, Booth v. Birmingham News Co.*, 704 F.Supp. 213, 215 (N.D.Ala) *aff'd*, 864 F.2d 793 (11th Cir.1988). It may, however, suggest a discriminatory animus. *See,Weaver, supra.* Once a prima facie case is established, the burden shifts to the defendant to articulate a nondiscriminatory basis for the action. *Meeks, supra. Wu v. Thomas*, 863 F.2d 1543 (11th Cir.1989). If the defendant does so, the plaintiff must then persuade the court that a discriminatory reason more likely motivated the employer. *See, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The plaintiff apparently claims that his position as Unit Leader was removed from him and his job of scheduling was taken away by Marlow. However, other than hearsay statements he has not shown that this was actually done. He was not told by Marlow that he was being removed from the position and has continued to receive the extra pay for the position. Furthermore, he states that he did not believe that this was done due to his lawsuit or his charge. Thus, as to this claim, he has not shown any connection with his participation in protected activities.

Though somewhat confusing, it appears that he also claims that he was to be moved to a different wing and told that his shift would change. However, this did not happen. He also asserts that all of the people on his wing were moved to the other wing at some time around the filing of this action and he was not moved until a later time. He then believed that if he was move back to the original wing, he would be fired. He was moved back to the original wing, and was not terminated. The plaintiff has not shown that this had any relationship to his lawsuit or the EEOC charge.

Thus, any claims by the plaintiff based on retaliation must also fail and IT IS RECOMMENDED THAT the Defendants' Motion for Summary Judgment on this ground be GRANTED as well.

### SUMMARY

IT IS ORDERED THAT the defendants' Motion to Exceed Page Limit is GRANTED.(15).

IT IS RECOMMENDED THAT the defendants' Motion for Summary Judgment (10) be GRANTED.

IT IS FURTHER RECOMMENDED THAT the plaintiff's Motion for Summary Judgment be DENIED. (11).