James E. **RODGERS,** Plaintiff–Appellee, Cross–Appellant,

v.

**WESTERN–SOUTHERN LIFE INSURANCE COMPANY,** Defendant–Appellant, Cross–Appellee.

Nos. 93–1125, 93–1266.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1993.

Decided Dec. 17, 1993.

---

the right to counsel would not affect the timeliness of the application.

Curry First (argued), Lawrence G. Albrecht, Gretchen E. Miller, Hall, First & Patterson, Milwaukee, WI, for James E. Rodgers.

Lawrence T. Lynch, Anita M. Sorensen (argued), Foley & Lardner, Milwaukee, WI, for Western–Southern Life Ins. Co.

Gwendolyn Young Reams, Donald R. Livingston, Robert J. Gregory (argued), Lorraine C. Davis, E.E.O.C., Office of Gen. Counsel, Washington, DC, for E.E.O.C. amicus curiae.

Before FLAUM and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

On April 27, 1989, after exhausting state administrative remedies, James E. Rodgers ("Rodgers") brought suit in federal district court against his former employer, Western–Southern Life Insurance Company ("Western–Southern"). Rodgers alleged that Western–Southern discriminated against him by creating a racially hostile environment in violation of Title VII of the Civil Rights Act of 1964 and the Fourteenth Amendment and in so doing constructively discharged him. The district court dismissed Rodgers' Fourteenth Amendment claim on the ground that Western–Southern is not a state actor. Following a bench trial, the district court held Western–Southern liable under Title VII for maintaining a racially hostile work environment and awarded back pay to Rodgers in the amount of $101,674.78 under the constructive discharge theory. The court also ordered Western–Southern to provide Rodgers with an annuity in accordance with its pension plan. Western–Southern appeals from the court's liability determination and its award of back pay. Rodgers cross-appeals from the court's failure to award front pay. For the following reasons, we affirm the district court in all respects.

I.

James E. Rodgers was employed in the Milwaukee, Wisconsin office of Western–Southern Life Insurance Company from 1973 until 1985. Throughout Rodgers' period of employment, Western–Southern's Milwaukee office employed approximately eighteen to twenty Sales Agents who reported to four Associate Sales Managers who, in turn, reported to one District Sales Manager. The District Sales Manager during this entire period was William Mann ("Mann"). In addition to supervising the overall operation of the Milwaukee office, Mann also hired all

Sales Agents, including Rodgers. Mann is a white man; Rodgers is a black man.

Rodgers began his tenure with Western-Southern as a Sales Agent, a position that required Rodgers to sell insurance policies, collect premiums from policyholders, negotiate policy loans and transfers, and perform weekly and monthly accounting of the premiums he collected. As of 1973, four of the Milwaukee-based Sales Agents were black, and that number increased to six or seven by the time Rodgers quit in 1985. By all accounts, Rodgers compiled an outstanding record as a Sales Agent and experienced no significant conflicts with any of the Associate Sales Managers who supervised him.

In 1980, Rodgers received a promotion to Associate Sales Manager, a position which he held until his resignation in 1985. At that time, two black men—Rodgers and Mark Thomas ("Thomas")—and two white men filled the four Associate Sales Manager positions. Rodgers' duties as a Associate Sales Manager consisted of supervising five Sales Agents, reporting directly to District Sales Manager Mann on a daily basis, assisting the Sales Agents in making sales, training new Sales Agents, and assisting the new agents in their preparation for the state insurance sales licensing examination. In addition to performing their own duties, Associate Sales Managers also were expected to service "open accounts"—accounts vacated when one of the Sales Agents quit—until a replacement Sales Agent was hired. Not surprisingly, these extensive duties required Associate Sales Managers to work long hours. In a typical week, Rodgers and his colleagues logged twelve-hour days from Monday through Friday, and often put in several more hours on Saturday and occasionally on Sunday.

It is undisputed that Mann and the Associate Sales Managers had a difficult working relationship. In fact, Western-Southern concedes that Mann regularly resorted to profanity and personal insults in trying to motivate his subordinates. Many of Mann's insults, at least on their face, were race-neutral. For example, Mann routinely referred to the Sales Managers as "knobheads," "knuckleheads," "dunderheads," and "goons."

When Mann wished to summon Rodgers to his office, Mann referred to Rodgers by his nickname, Rabbit, apparently to the amusement of the other agents. Mann also admonished Rodgers on one occasion with the statement: "You must think you're back in Arkansas chasing jackrabbits." The parties dispute whether this last statement, though neutral on its face, has racial overtones. The district court found that Rodgers "not unreasonably construed [this remark] as a racial slur intended to malign his black, southern heritage and to suggest that he should not have become an insurance agent." Finally, in addition to verbal abuse, on one occasion Mann emptied the contents of Rodgers' desk drawers onto Rodgers' desktop because he was unable to find something in the desk.

Mann's comments were not limited to race-neutral epithets. Rodgers testified that Mann used the word "nigger" twice in Rodgers' presence. Rodgers' colleague, Mark Thomas, testified that he heard Mann use the term "nigger" five to ten times during Thomas' tenure with Western-Southern. About six months before Rodgers quit, Mann stated in a bold, demanding tone: "You black guys are too fucking dumb to be insurance agents." Mann conceded that he might have made this statement. On another occasion, Mann told Rodgers that Mann's boss, Divisional Vice-President Dennis Lehman ("Lehman") had advised Mann not to hire any more black agents.

On two occasions, Mann's comments at sales managers' meetings so angered Rodgers that he walked out, but neither Rodgers nor Thomas ever directly confronted Mann regarding his racially offensive comments. By 1983, Rodgers began to experience physical problems that he attributed at trial to the combination of harsh treatment and racist language to which Mann subjected him at work. Rodgers received medical treatment, including stress therapy, which he discontinued after one year because the constant pressure at work limited the treatment's effectiveness.

Despite his job-related stress, Rodgers continued to work as an Associate Sales Manager. Early in 1985, one of Rodgers' Sales Agents quit, leaving Rodgers with an

open account to service in addition to his other duties. In March, 1985, Mann increased the size of the open account from $23,000 in average annualized premium to approximately $80,000. The parties disagree as to Mann's motivation for this increase, but after weighing the evidence adduced at trial, the court found that Mann's enlargement of the open account was not racially motivated. Nevertheless, Rodgers reached the conclusion that he could not cope with the additional work load on top of the work-related stress he already was experiencing. At this point, Rodgers asked Mann for a demotion from Associate Sales Manager to Sales Agent. Mann persuaded Rodgers to reconsider his request by agreeing that Rodgers could reduce his responsibility for servicing accounts to two nights a week. This agreement was short-lived. Within a few weeks, Mann threatened to fire Rodgers because he was not spending enough time servicing accounts. Finally, in early May, Mann informed Rodgers that one of Rodgers' Sales Agents, Michael Taylor ("Taylor"), would be fired because Taylor had failed his licensing examination for the second time. Rodgers, fearing the prospect of having to service a second open account, orally renewed his request to be demoted to Sales Agent. Both Rodgers and Mann were aware that such a request should have been made in writing, but Mann advised Rodgers that Mann would not consider such a request in any case. Mann stated that Rodgers could either remain as an Associate Sales Manager or quit. On May 20, 1985, Rodgers quit. Rodgers' resignation letter provided as follows:

Dear Mr. Mann:

Due to my health and other things as of Monday, May 20, 1985, I will no longer be working for Western–Southern Life Insurance Co.

Sincerely,
James Rodgers

After Rodgers resigned, Mann attempted to contact Rodgers in an effort to persuade him to reconsider. Mann's personal efforts to contact Rodgers failed, so Mann asked Thomas to try reaching Rodgers. Two weeks later, Thomas spoke with Rodgers, but was unable to convince him to return to Western–Southern. Following his resignation, Rodgers worked for a few months for John Deere Insurance Company. In 1987, Rodgers accepted employment as a job placement specialist with the Next–Door Foundation, a community service organization, where he continued to work through the date of the trial. Mann was transferred to Western–Southern's Indiana office in 1986.

On July 19, 1985, about two months after his resignation, Rodgers filed a timely charge of discrimination with the Wisconsin Equal Rights Division of the Department of Industry, Labor, and Human Relations ("ERD"). On January 25, 1989, an ERD administrative law judge determined that Rodgers had failed to prove by a fair preponderance of the evidence that Western–Southern had violated the Wisconsin Fair Employment Act by discriminating against Rodgers on the basis of his race.[1] On April 3, 1989, Rodgers received notice of his right to sue from the EEOC. He filed suit in federal district court on April 27, 1989.

Following a two-day bench trial, the district court issued its decision on May 9, 1992 792 F.Supp. 628. The court held Mann had subjected Rodgers to unlawful racial harassment and that Western–Southern therefore was liable under Title VII for maintaining a racially hostile work environment. The court also concluded that Rodgers had been constructively discharged because of work-related stress resulting from a combination of (1) an increased workload and (2) Mann's use of derogatory and racially offensive language. After viewing supplemental submissions of the parties on the issue of damages, the district court entered judgment in favor of Rodgers in the amount of $101,674.78 and ordered Western–Southern to provide an annuity to Rodgers in accordance with its pension plan. Western–Southern filed a timely appeal of this judgment, and Rodgers filed a cross-appeal with respect to the issue of damages.

---

1. On October 12, 1989, the Wisconsin Labor and Industry Review Commission affirmed the administrative law judge's decision.

## II.

■ Title VII of the Civil Rights Act of 1964 [2] prohibits an employer from engaging in racial harassment that creates a hostile or offensive working environment. *Patterson v. McLean Credit Union,* 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Daniels v. Essex Group, Inc.,* 937 F.2d 1264, 1270 (7th Cir.1991). As the Supreme Court noted in *Meritor,* "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404 (citing *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). This court repeatedly has recognized that racial harassment is an independent basis for a Title VII claim. *Daniels,* 937 F.2d at 1270; *Nazaire v. Trans World Airlines, Inc.,* 807 F.2d 1372, 1380 (1986), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987).

Rodgers' claim was tried to the bench, with both sides relying primarily on witness testimony to present and rebut evidence. On appeal, we are benefitted by the district court's extensive findings of fact and credibility determinations. On the one hand, the court specifically found that neither Mann's enlargement of Rodgers' open account nor Mann's refusal to permit Rodgers to relinquish his position as Associate Sales Manager was racially motivated. Further, the court found that Mann's decision to retain Taylor after initially indicating that Taylor would be fired and that Taylor's open account transferred to Rodgers was not racially motivated. On the other hand, the court also found that Rodgers: (1) was "deeply offended" by Mann's use of the term "nigger", even if Mann had not directed that epithet at Rodgers personally; (2) took Mann's declaration that "[y]ou black guys are too fucking dumb to be insurance agents", though directed at Rodgers' black Sales Agents, to imply

that Rodgers himself was not qualified to be an insurance agent because of his race; (3) found offensive Mann's statement that Lehman had advised him not to hire any more black agents; and (4) reasonably construed Mann's remark that "[Rodgers] must think [he's] back in Arkansas chasing jackrabbits" as a racial slur. The court concluded that these four remarks encouraged Rodgers to view even Mann's race-neutral decisions as racially-motivated efforts to force Rodgers' resignation. In addition, the court found credible Rodgers' testimony that Mann's racist remarks significantly impaired Rodgers' work performance, constituted one of two factors resulting in work-related stress that compelled Rodgers to quit, and harmed Rodgers' self-esteem. Finally, the court concluded that Mann's racist remarks "undeniably had a profound psychological effect upon Rodgers," and "made Rodgers feel as though Mann questioned Rodgers' professional competence because of his race."

■ Our review of findings of fact, especially when such findings turn on determinations of credibility, is governed by Rule 52(a) of the Federal Rules of Civil Procedure. Rule 52(a) provides that:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

In *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Supreme Court explained the meaning of the phrase "clearly erroneous" in Rule 52(a). Under *Anderson,* a district court's finding of fact is clearly erroneous only when "the reviewing court is left with the definite and firm conviction that a mistake has been committed." 470 U.S. at 573, 105 S.Ct. at 1511. When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the district court be-

---

**2.** Title VII states in relevant part: "It shall be an unlawful employment practice for an employer— to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e– 2(a)(1) (1993).

cause "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575, 105 S.Ct. at 1512, citing *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In this circuit, appellate review of credibility determinations is so limited that:

> We shall reject a district judge's decision to believe oral testimony only where the testimony is seriously inconsistent internally, or contrary to established laws of nature or otherwise fantastic, or irreconcilably in conflict with indubitable documentary or physical evidence, stipulations of facts, admissions, or evidence of equivalent certainty.

*Bullard v. Sercon Corp.,* 846 F.2d 463, 466 (7th Cir.1988) (internal citations omitted).

■■■ The existence of racial harassment in a hostile work environment involves an application of facts (the specific discriminatory conditions alleged by the plaintiff) to law (the standards governing the existence of racial harassment and hostile work environment discrimination). *See Daniels,* 937 F.2d at 1269. In *Daniels,* this court declined to adopt a multi-factor test for Title VII harassment claims because such a test "has the potential for a mechanical application that overlooks or underemphasizes the most important features of the harassment inquiry." *Id.* at 1271. Instead, we have evaluated Title VII harassment claims against both an objective and subjective standard. *Id.* (racial harassment claim); *Brooms v. Regal Tube Co.,* 881 F.2d 412 (7th Cir.1989) (sexual harassment claim). As we explained in *Brooms,* this conjunctive approach allows us to consider "the likely effect of a defendant's conduct upon a *reasonable* person's ability to perform his or her work and upon his or her well-being as well as the *actual* effect upon the *particular* plaintiff bringing the claim." 881 F.2d at 419 (emphasis added). Because the district court properly understood and applied this two-part test for finding racial

harassment in a hostile work environment, we also apply the clear error rule to the court's finding that the facts of this case satisfy the test. *Daniels,* 937 F.2d at 1269–1270.

### III.

### A.

■■■ As the district court properly noted, in reviewing the reasonableness of a harassment or hostile environment claim under the objective standard, a court may consider:

> the nature of the alleged harassment, the background and experience of the plaintiff, her coworkers and supervisors, the totality of the physical environment of the plaintiff's work area, the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectations of the plaintiff upon voluntarily entering that environment.

*Daniels,* 937 F.2d at 1274. The determination of defendant's liability under Title VII "must be made on a case-by-case basis after considering the totality of the circumstances." *Nazaire,* 807 F.2d at 1380–1381. Within the totality of circumstances, there is neither a threshold "magic number" of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim. *Daniels,* 937 F.2d at 1273–1274. Here, as in most cases, the alleged number of harassing incidents is greater than one, but cannot be said to constitute a "pervasive pattern." Western–Southern contends that the district court committed clear error in finding liability under Title VII on the basis of comments that were either race-neutral or admitted by Rodgers to be irrelevant to Rodgers' hostile environment claim. We now examine Western–Southern's claims *seriatim* under the objective standard.[3]

---

3. In its appellate brief, Western–Southern addressed Rodgers' specific allegations of harassment under the heading "The Trial Court's Findings of Fact That Western–Southern Maintained

a Racially Hostile Work Environment Are Not Supported By Substantial Evidence in the Record And Are Clearly Erroneous". Brief at 19. We therefore read Western–Southern to be ob-

■ First, Western–Southern argues that the district court committed clear error in finding that Mann's use of the word "nigger" contributed to a hostile work environment. In support of this argument, Western–Southern asks this court to consider the context in which that word was used.[4] The record indicates that Mann used the word twice in Rodgers presence, though Rodgers could not recall the precise context in which it was used. The record also indicates that black employees, including Thomas and Rodgers himself, also used this word in the workplace. We find Western–Southern's argument unpersuasive. Perhaps no single act can more quickly "alter the conditions of employment and create an abusive working environment," *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405, than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates. *See Bailey v. Binyon*, 583 F.Supp. 923, 927 (N.D.Ill.1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination *per se*."). The fact that black employees also may have spoken the term "nigger" does not mitigate the harm caused by Mann's use of that epithet; a supervisor's use of the term impacts the work environment far more severely than use by co-equals.

Second, Western–Southern submits that the district court committed clear error in finding that Mann's statement "[y]ou black guys are too fucking dumb to be insurance agents" contributed to a racially hostile work environment. Western–Southern again urges this court to place the statement in context: it was an isolated statement used as a motivational technique at least six months prior to Rodgers' resignation. We are not moved by this argument. Mann's comment strongly implied that Rodgers and his fellow

black agents were not qualified to be insurance agents solely because of their race. Title VII does not permit supervisors to use this type of blanket criticism of the intelligence of a racially-defined class of employees as a motivational technique. Furthermore, the six month lapse between Mann's utterance of the statement and Rodgers' resignation does not sever the causal connection between the statement and the resignation. In examining the "totality of circumstances" giving rise to Rodgers' action, the district court properly considered the cumulative weight of Mann's several "isolated" racial comments. *See Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla.1991) ("[A] holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes."). Mann's comment that "black guys are too fucking dumb to be insurance men" would have adversely affected a reasonable employee's ability to perform his or her work, and the district court thus correctly relied upon it in finding Western–Southern liable under Title VII.

Third, Western–Southern contends that the district court committed clear error in finding that Mann's statement to Rodgers that Mann's boss, Divisional Vice–President Dennis Lehman, had advised Mann not to hire any more black agents contributed to a racially hostile work environment. Western–Southern maintains that the court's finding conflicts with Rodgers' testimony at trial to the effect that Mann's "hiring" statement "didn't really have that much effect on my decision to stay or not." Again, at least under the objective analysis, we disagree.[5]

---

jecting not to the district court's findings of fact *per se*, but rather to the district court's findings as to whether the facts meet the applicable legal standard. In any event, as noted above, the same standard of review—clearly erroneous—applies both to the district court's findings of fact and to the court's findings as to whether the facts meet the applicable legal standard.

4. Another black employee, Associate Sales Manager Mark Thomas, testified that he heard Mann

use the word "nigger" in the workplace between five and ten times.

5. Even under a subjective analysis, we believe that Rodgers' testimony does not foreclose the possibility that Mann's "hiring" comment had *some* effect on Rodgers' decision to resign. Rodgers merely stated that Mann's comment did not have "that much effect" on his decision, not that it had no effect at all.

As with Mann's comment about the intelligence of the black sales agents, Mann's "hiring" comment strongly implied criticism of a class of employees solely on the basis of their race. Even if a reasonable employee would have been affected no more than Rodgers was by the "hiring" comment, we conclude that the district court appropriately relied on this comment to support its finding of liability under Title VII.

■ Fourth, Western–Southern maintains that the district court committed clear error in finding that Rodgers "not unreasonably" construed Mann's statement, "You must think you're back in Arkansas chasing jack rabbits," as a racial slur intended "to malign [Rodgers'] black, southern heritage and to suggest that he should not have become an insurance agent." Western–Southern asserts that, at worst, this remark was a race-neutral insult to people from the State of Arkansas. In contrast to the aforementioned words and phrases uttered by Mann, all of which are expressly race-based insults, we find Western–Southern's characterization of the "jack rabbit" comment as "race-neutral" as plausible as the court's finding that the comment was a racial slur. Nevertheless, when "there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511; *Amadeo v. Zant,* 486 U.S. 214, 226, 108 S.Ct. 1771, 1778, 100 L.Ed.2d 249 (1988); *Daniels,* 937 F.2d at 1268. Thus, we cannot find that the district court committed clear error to the extent it considered the "jack rabbit" comment as support for its finding of Title VII liability.

Finally, Western–Southern submits that Mann's use of Rodgers' nickname "Rabbit" and his use of terms such as "Knobheads," "Knuckleheads," "Dunderheads," and "Goons", though possibly abusive, cannot be used to support a racially hostile environment claim because such terms have no independent racial connotations. Conceding, *arguendo,* that these words are race-neutral insults, we find no error because the record is devoid of any evidence that the district court relied on Mann's use of these particular terms in reaching its decision.

Thus, after consideration of Western–Southern's many objections, we determine that the trial court did not err in its conclusion that Rodgers satisfied the objective prong of the test for Title VII racial harassment claims.

## B.

We now examine the court's application of the subjective standard. The court determined that Mann's racist comments "had a profound psychological effect upon Rodgers." More specifically, the court found that Rodgers was "deeply offended" by Mann's use of the term "nigger" and took Mann's comment about the intelligence of Rodgers' black sales agents to imply that Rodgers himself was not qualified to be an insurance agent because of his race. The court added that Mann's race-neutral insults further reduced Rodgers' self-esteem and ability to work, "making Mann's racist references, epithets, and comments even more lethal to Rodgers' ability to perform his job."

Western–Southern insists that the district court's finding that Rodgers carried his burden under the subjective standard is clearly erroneous because the record reveals that Rodgers was not offended by Mann's racial insults. While conceding that the word "nigger" can be offensive, Western–Southern submits the following as evidence that Rodgers did not take personal offense to its usage: (1) Rodgers could not identify the context in which Mann uttered the word, (2) Rodgers himself used the word in the workplace, and (3) Rodgers admitted that Mann never used the word in reference to him. Likewise, Western–Southern claims that Mann's insult to the intelligence of Rodgers' black sales agents did not cause Rodgers any personal harm. According to Western–Southern, Rodgers' resignation was attributable solely to the stress and pressure associated with an increase in his workload.

We are mindful of the inherently stressful nature of Rodgers' job, and we note in passing that Rodgers would not have an action under Title VII if Mann had not mixed racist comments into his daily routine of race-neutral verbal abuse. Nevertheless, after care-

ful review of the district court's factual and credibility findings, we are persuaded that Mann's racist comments and taunts, though perhaps not the sole factor, contributed significantly to the stress condition that compelled Rodgers to resign from Western–Southern. We do not find Rodgers' claim diminished by the lapse of time between the utterance of the racially offensive remarks and his resignation. In *Daniels* this court "acknowledg[ed] the different ways in which a plaintiff initially responds to or copes with harassment." 937 F.2d at 1272. The employee may quit "cold turkey" or, as in Rodgers' case, "may experience a prolonged period of turmoil." *Id.* The facts here reveal that Mann's unlawful racial abuse gradually eroded Rodgers' self-esteem and adversely affected his job performance. Rodgers thus discharged his burden under the subjective prong of our test for Title VII racial harassment claims.

## IV.

■ Because Title VII provides only for equitable relief, a district court may award back pay to a plaintiff only if the plaintiff can demonstrate that the defendant discharged him or her, either actually or constructively. *Brooms v. Regal Tube Co.,* 881 F.2d 412, 423 (7th Cir.1989). Here the district court determined that Western–Southern constructively discharged Rodgers and awarded Rodgers back pay in excess of $101,000 (as well as an annuity pursuant to Western–Southern's pension plan). According to Western–Southern, we must reverse because the district court failed to analyze Rodgers' constructive discharge claim according to the appropriate Seventh Circuit standard under which, Western–Southern argues, Rodgers could not prevail.

■ In deciding whether an employee has been constructively discharged, this circuit has adopted a test that focuses on the impact of the employer's actions on a reasonable person. *Id.* In *Brooms* we held that constructive discharge is established where "a reasonable employee would have felt compelled to resign under the circumstances of th[e] case." *Id.* at 423; *see also Bartman v. Allis–Chalmers Corp.,* 799 F.2d 311, 314 (7th

Cir.1986), *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987) (finding constructive discharge where the unlawful conduct makes an employee's working conditions "so intolerable that the employee is forced into an involuntary resignation."). In *Brooms* we also cited with approval language from *Bailey v. Binyon,* 583 F.Supp. 923, 929 (N.D.Ill.1984), noting that "[a]n employee must seek legal redress while remaining in his or her job unless confronted with an 'aggravated situation' beyond 'ordinary' discrimination."

Rodgers concedes that the district court did not expressly articulate this standard, as expressed either in *Bartman* or *Brooms,* in rendering its decision that Rodgers was constructively discharged. Nevertheless, Rodgers argues that we should affirm because the district court's extensive findings of fact are entirely consistent with its ultimate conclusion that Rodgers was compelled to resign because of a racially hostile working environment. Specifically, Rodgers relies on the court's finding that Rodgers was "prevented" from continuing in his job, and therefore "compelled to quit" because of stress caused at least in part by Mann's use of racially offensive language.

While our task on appellate review would have been simplified if the district court had explicitly applied the relevant legal standard in linking its factual findings to its conclusion, we find that the court's factual findings and credibility determinations are sufficient to support the conclusion that Rodgers was constructively discharged. To be sure, whether this case involves "aggravated" or "ordinary" discrimination is a close question. On balance, however, the fact that the insults generating the racially hostile environment flowed from the mouth of a supervisor— indeed, the highest ranking employee in the Milwaukee office—persuades us that Rodgers encountered "aggravated" discrimination. Under these circumstances, we agree that a reasonable employee would have felt compelled to resign. Hence, we affirm the district court's finding of constructive discharge and the award of back pay.

## V.

The final issue to be resolved is Rodgers' cross-appeal seeking front pay. Western–Southern insists that Rodgers waived any claim to front pay by not raising the issue in the district court. Rodgers responds by asking this court to excuse his failure to present the front pay claim because Rodgers represented himself in the trial court. Recognizing that "[c]ourts often bend over backward to prevent forfeitures by lay persons who, in filing charges, cannot be expected to know the legal buzzwords," *O'Rourke v. Continental Casualty Co.*, 983 F.2d 94, 97 (7th Cir.1993), we will proceed to the merits of Rodgers' cross-appeal.

The very question of whether a district court *may* order front pay as part of the equitable relief permitted by Title VII remains an open question in this circuit. *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 561 n. 13 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993); *Fortino v. Quasar Co.*, 950 F.2d 389, 398 (7th Cir.1991). The preferred remedy in employment discrimination cases is reinstatement which courts order unless it is infeasible or inappropriate. *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1055 (7th Cir.1990). After trial in this case, Rodgers declined Western–Southern's offer of reinstatement to either the Sales Agent or Associate Sales Manager position. In so doing, Rodgers made no showing that it would have been infeasible or inappropriate for him to return to Western–Southern as of May, 1992, the time at which the most recent reinstatement offer was made. In fact, the record establishes that Mann, whose racial comments had been the impetus for Rodgers' constructive discharge, long since had left the Milwaukee office. Under these circumstances, even if front pay were a recognized Title VII remedy in this circuit, we cannot conclude that the district court abused its discretion in declining to award such a remedy to Rodgers.

## VI.

Title VII does not guarantee stress-free employment, but it does protect employees from toiling in a hostile working environment created by their employers use of racial slurs and epithets. The facts of this case clearly support the district court's judgment that Mann's racist remarks to Rodgers were so racially derogatory that they impaired Rodgers' ability to do his job and would have similarly affected any reasonable employee. Furthermore, the court's factual findings and credibility determinations are sufficient to sustain the conclusion that a reasonable employee would have felt compelled to resign under the circumstances presented here. We therefore affirm the finding of Title VII liability against Western–Southern and the award of back pay under a constructive discharge theory. With regard to Rodgers' cross-appeal, we conclude that the district court did not abuse its discretion in declining to award front pay to Rodgers. In all respects, the judgment of the district court is

AFFIRMED.