**Robert M. LOPEZ, Plaintiff,**

v.

**UNION TANK CAR COMPANY,
Defendant.**

**No. 2:96 CV 055JM.**

United States District Court,
N.D. Indiana,
Hammond Division.

June 1, 1998.

Ivan Bodensteiner, Valparaiso, IN, for Plaintiff.

James Convery, Clifford Perry, II, Robert Brown, Chicago, IL, for Defendant.

## ORDER

MOODY, District Judge.

In this civil rights action plaintiff Robert M. Lopez makes four claims against his former employer, defendant Union Tank Car Company ("Union"): 1) race/national origin discrimination as the cause of a poor performance evaluation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981; 2) racial/national origin harassment in the workplace, in violation of

Title VII and § 1981; 3) discriminatory discharge from employment, based on race/national origin, age and disability, in violation of Title VII and § 1981, the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. § 623 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*; and 4) retaliatory discharge from employment for having complained about discrimination, in violation of Title VII. Union moves for summary judgment, in a nutshell contending that Lopez was one of four employees discharged as part of a reduction-in-force, selected because his supervisor found his work performance poor.

RULE 56 of the FEDERAL RULES OF CIVIL PROCEDURE requires that summary judgment be granted "forthwith" if the pleadings and discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A defendant may obtain summary judgment by showing that there is an absence of evidence on a material element of plaintiff's case, forcing the plaintiff to come forward with facts requiring a trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 795–6 (7th Cir. 1997).

In other words, to the extent a defendant's summary judgment motion "pokes holes" in a plaintiff's case, the plaintiff must go beyond the allegations of his pleadings and point to disputed facts creating a genuine issue for trial, that is, evidence that would allow a reasonable jury to decide the case in the plaintiff's favor. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, viewing the record and all reasonable inferences therefrom in the light most favorable to the plaintiff no reasonable jury could find in the plaintiff's favor, a summary judgment should be entered for the defendant. *See Bruner Corp. v. R.A. Bruner Co.*, 133 F.3d 491, 495 (7th Cir.1998).

*Statement of Facts*

The following description of the parties' dispute is taken from the parties' materials submitted in compliance with Local Rule 56.1, and summarizes the facts not in dispute or, where there is a dispute, describes the version of the facts most favorable to plaintiff. For the purpose of explaining defendant's position, some disputed facts are described in defendant's favor: the context makes clear when this is the case, and of course, facts in that light are not considered when deciding whether defendant is entitled to summary judgment.

Plaintiff Robert Lopez was 46 years old at the time of his discharge on July 12, 1995. Lopez is of Hispanic descent, and suffers from polio and post-polio syndrome. At the time of his discharge Lopez was employed as a "layout draftsman/CAD operator" in Union's drafting department. Lopez had been employed by Union since October, 1977.

The person with overall supervisory responsibility for the drafting department is known as the Chief Draftsman. Beginning March 3, 1992, the Chief Draftsman was Dennis Chansler. According to Union, the Chief Draftsman is the "sole supervisor" in the drafting department and the only individual authorized to make hiring/firing decisions.

The drafting department is organized into groups, each of which typically consists of (in descending order of responsibility) a group leader, a designer, a layout draftsman (Lopez's job) and a draftsman. Lopez was promoted to the layout draftsman position in February 1992 by Thomas Cafferata, the then-Chief Draftsman. Chansler disagreed with the promotion.

Union uses standard forms to perform annual employee evaluations. Typically, an employee's group leader completes the form and forwards it to Chansler. Chansler discusses the evaluation with the group leader and in some cases modifies the evaluation. In cases where an employee works for more than one group leader during a year, however, Chansler completes the evaluation form himself after soliciting comments from each of those group leaders.

On his evaluation covering 1992, prepared by group leader Richard Benak, Lopez was rated 4.0 on a five-point scale. The form describes a 4.0 rating as "SUPERIOR (Far

above expected performance.)" Prior to preparing that evaluation, Benak recommended to Chansler that Lopez be promoted to the designer position, but Chansler disagreed. On his evaluation covering 1993, also prepared by Benak, Lopez was rated 3.7. Benak had rated Lopez 3.96, but Chansler modified the rating. A 3.0 rating is "COMMENDABLE (Achieves all key responsibilities.)"

Lopez worked for Benak during the first six months of 1994, then for other group leaders. Chansler prepared Lopez's evaluation for 1994, and rated Lopez 2.82. A rating of 2.0 is "MARGINAL (Performance acceptable but should improve.)"

In preparing the evaluation for 1994, Chansler deviated from his normal practice by not soliciting input from Benak. According to Chansler, he did not consult with Benak at least in part because Chansler believed that Benak had rated Lopez too highly in the past. The group leaders Chansler did consult with included Carl Carney, who regularly referred to Lopez as a "wetback" and who, in a June 1994 meeting including Chansler and other group leaders, announced "no spics allowed" when he entered the room and observed that Lopez was present.

On March 14, 1995, Lopez sent a memo to Philip Daum, Union's Chief Engineer, and Benjamin Damiani, Union's Vice President of Engineering, complaining that Chansler's evaluation was "not objective," "demeaning," and "meant to defame my ability as a layout draftsman." Daum and Lopez met and discussed the review on March 20, 1991. On March 21, 1995, a confidential memo written by Daum detailing "plans to achieve the Plant 1 staffing reduction goals" recommended reducing the drafting staff by two, including Lopez.

On April 8, 1995, Lopez filed a charge with the Equal Employment Opportunity Commission ("EEOC") concerning Chansler's evaluation covering 1994. In or around May 1995, Chansler and Daum discussed reducing the size of the drafting department. Chansler decided to discharge four people, and identified eight candidates for discharge, one of whom was Lopez. Although Lopez initially was not one of the more likely candidates, by late May Chansler had decided to discharge Lopez. Chansler learned from Daum sometime in April or May that Lopez had filed an EEOC charge concerning Chansler's evaluation of Daum.

The July 12, 1995, letter informing Lopez of his discharge states that "the position of Layout Draftsman which you currently hold is being eliminated." On the same day, Tim Prasky, a white male, was promoted to the position of layout draftsman, albeit in a different group. Chansler made the decision to promote Prasky around June 13, 1995.

In contradiction to Lopez's termination letter, Chansler states that there was no decision to eliminate certain positions, and that Lopez was selected due to deteriorating performance in 1995. If Lopez had continued to perform at his pre-February 1995 level, Chansler would not have selected him for discharge. Prior to discussing workforce reduction with Daum in May 1995, Chansler had not considered discharging Lopez.

Lopez complained to Benak about harassing conduct directed at him by group leaders and other employees. Benak witnessed harassment of Lopez, including slurs such as "cockroach," "fucking Mexican" and "fucking spic." Benak observed numerous occasions when Lopez was criticized about his physical handicap, including comments about his arms.

*Claim 1: race/national origin discrimination causing a poor performance evaluation*

■ The first indication (in this litigation) that Lopez considered his poor evaluation to be a claim actionable in and of itself came when he listed it as such in response to Union's motion for summary judgment, and argued that Union's

> motion for summary judgment, while not referred to as a motion for *partial* summary judgment, does *not* seek summary judgment on the discriminatory evaluation claim. Therefore, this claim will not be addressed here....

Plaintiff's Response Brief at 11. Thus, Lopez implicitly argues that even if Union's motion for summary judgment were granted, a discriminatory evaluation claim would remain for the jury's consideration.

In its reply brief, Union asserts that it did move for summary judgment on Lopez's discriminatory evaluation claim, in that the claim is "part and parcel" of Lopez's discriminatory discharge claim, and Union in footnote 17 of its opening brief stated that "no reasonable factfinder could determine that ... Plaintiff's February 8, 1995 review was based on his race/national origin." Union's Reply Brief at 17. Almost as an afterthought, Union questions whether a poor evaluation is even an actionable claim, citing *Gustovich v. AT & T Communications*, 972 F.2d 845, 847 (7th Cir.1992).

The answer is, it is not. *Smart v. Ball State University*, 89 F.3d 437, 442 (7th Cir. 1996) holds that undeserved negative performance evaluations alone are not adverse action sufficient to sustain a discrimination action. Instead, as Union argues, Lopez's poor review is an integral part of his discharge claim, in that, if undeserved, it serves as evidence of discrimination. *Id.* Lopez has no separate and distinct claim regarding a discriminatory performance evaluation that may go to the jury or need be discussed further in this order.

*Claim 2: racial/national origin harassment in the workplace.*[1]

■■■■ A plaintiff attempting to prove discrimination based upon a racially or ethnically hostile environment must establish not only the existence of harassment so severe and pervasive that it alters the terms and conditions of plaintiff's employment, from both a subjective and objective view,[2] but also that plaintiff's employer acted negligently with respect to the harassment; that is, knew or should have known that it was taking place, and failed to take reasonable remedial action. *See Jansen v. Packaging Corp.*

*of America*, 123 F.3d 490, 546 (7th Cir.1997), *cert. granted sub nom., Burlington Industries v. Ellerth*, —— U.S. ——, 118 S.Ct. 876, 139 L.Ed.2d 865 (1998) (Coffey, J., concurring and dissenting) ("as the law in this Circuit currently stands, hostile work environment claims for harassment on the basis of race are analyzed pursuant to a negligence standard"), *citing Daniels v. Essex Group, Inc.*, 937 F.2d 1264 (7th Cir.1991).

Union's motion for summary judgment is based on one ground:[3] that because Lopez's supervisor, Dennis Chansler, denies any knowledge that "any employee made any comments regarding Plaintiff's age, disability and/or race/national origin," Affidavit of D. Chansler at ¶ 64, and Lopez admits that he never reported any derogatory comments to Chansler, Deposition of R. Lopez at 425–26, Union had no knowledge of harassment and so cannot be found negligent in failing to act remedially.

In response, Lopez makes a number of arguments, some of which the court believes are simply wrong. For example, Lopez argues that *Baskerville v. Culligan International Co.*, 50 F.3d 428, 432 (7th Cir.1995) and 29 C.F.R. § 1606.8 together stand for the proposition that "before an employer can avoid liability because it was not aware of harassment by co-workers, it must have a policy (i) prohibiting such activity, and (ii) setting forth the procedures for victims to follow in seeking relief from the harassment." Plaintiff's Response Brief at 16. While it is true that at least six members of the Court of Appeals, citing *Baskerville*, appear to believe that "[p]ursuant to a negligence standard for supervisory harassment, we would presumably require a posted antisexual harassment policy," *Jansen*, 123 F.3d

---

1. The parties have not addressed the issue whether the elements of a cause of action under § 1981 vary from those under Title VII, so the court assumes that they are identical. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 884 n. 2 (7th Cir.1998).

2. *See Venters v. City of Delphi*, 123 F.3d 956, 975–76 (7th Cir.1997) (discussing harassment on the basis of religious beliefs); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938 (7th Cir.1996); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271–72 (7th Cir.1991).

3. Because the issue has not been raised in the motion for summary judgment and consequently not addressed in the parties' briefs, the court expresses no opinion whether there is sufficient evidence that "the quantity, frequency, and severity of the racial, ethnic, or sexist slurs create[d] a work environment so hostile as to discriminate against the minority employee." *Vore v. Indiana Bell Telephone*, 32 F.3d 1161, 1164 (7th Cir.1994).

at 498 (Flaum, J., concurring), it is not certain that the same pertains to harassment by co-employees. Moreover, the Supreme Court has commented that the existence of a policy is "relevant" but not necessarily "dispositive." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). While the Court's comments were made in an explanation why the existence of a policy does not insulate an employer from liability, the Court also noted that the policy at issue did not address sexual harassment, and yet held that the court below had "erred in concluding that employers are always automatically liable for sexual harassment by their supervisors." *Id.* at 477 U.S. 72–3, 106 S.Ct. at 2408.

Nevertheless, the court believes that Lopez has demonstrated that a question of fact exists whether Chansler had knowledge that Lopez's co-employees verbally abused Lopez. First, Lopez testified in his deposition that in 1987 or 1988 Chansler himself asked Lopez if he "was good at picking lettuce." [4] Deposition of R. Lopez at 402. Although this occurred before Chansler was promoted to the position where he had hiring/firing authority over Lopez, it occurred after Chansler became Lopez's group leader, a position where he had some authority to direct Lopez's work activities. *Id.* This comment, in and of itself, is evidence of a hostile environment. *Cf. Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993).

But more importantly, the "lettuce-picking" comment considered in conjunction with other evidence casts doubt on the credibility of Chansler's denial that he was not aware of any derogatory comments made by Lopez's co-employees. For example, Lopez also testified that at a meeting of group leaders called by Chansler after Chansler's promotion, a group leader named Carl Carney arrived late for the meeting and announced "no spics allowed." Deposition of R. Lopez at 253–4. Lopez "waited for Mr. Chansler to say something. He did not say a word." Id. In addition, before Chansler was promoted and obtained his own office, he worked "out

in the open" with the others making it possible for him to hear any one of a number of racial slurs and other derogatory comments directed at Lopez. Deposition of Richard A. Benak at 73–82.

Viewing the evidence in the light most favorable to Lopez, as the court must, there is a question of fact whether Chansler was aware of harassment directed at Lopez. As a result, Union is not entitled to summary judgment on this aspect of Lopez's suit.

*Claim 3: discriminatory discharge from employment.*

■ Lopez claims that he was discharged from his position on account of his race/national origin, his age, and his disability. Title VII prohibits an employer from discharging an employee because of his race or national origin. 42 U.S.C. § 2000e–2(a)(1). Section 1981 forbids any person, including an employer, from terminating a contract, including a contract of employment, on the basis of racial discrimination. 42 U.S.C. § 1981(a), (b). The ADEA makes it unlawful for an employer to discharge or otherwise discriminate against an individual of age forty through sixty-nine on the basis of age. 29 U.S.C. §§ 623(a)(1), 631(a). The ADA makes it unlawful for an employer to discharge or otherwise discriminate against a qualified individual because the individual has a disability. 42 U.S.C. § 12112(a).

Under each of these statutes, the plaintiff bears the ultimate burden of proving that he or she was discriminated against; that is, were it not for the plaintiff's protected characteristic, the defendant would not have taken the challenged action. *See Sattar v. Motorola, Inc.,* 138 F.3d 1164, 1169 (7th Cir. 1998) (Title VII); *Pilditch v. Board of Education,* 3 F.3d 1113, 1116 (7th Cir.1993) (§ 1981); *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 398 (7th Cir.1997) (ADEA); *DeLuca v. Winer Industries, Inc.,* 53 F.3d 793, 797–98 (7th Cir.1995) (ADA). Under each statute a plaintiff may do so by

---

4. Although Union's attorney expressed surprise in the deposition that Lopez perceived this comment to be related to his national origin, the court believes that anyone with any awareness of

Caesar Chavez and the plight of migrant farmworkers, and who was not raised in a cocoon, would understand the comment to be directed at Lopez's national origin.

utilizing the burden-shifting method[5] established for Title VII cases by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Pilditch*, 3 F.3d 1113 at 1116; *Kariotis v. Navistar International Transportation Corp.*, 131 F.3d 672, 676 (7th Cir.1997). While there is some variance in the elements of a prima facie case using the burden-shifting method, from statute-to-statute and depending on the particular facts in issue, a common element exists in every case where the plaintiff complains of wrongful discharge: the plaintiff must prove that he or she was meeting the employer's legitimate expectations for the position.

In the present case, Union addresses only this element of Lopez's prima facie case. Union contends that Chansler selected Lopez for termination as part of a reduction-in-force because Lopez was, in Chansler's subjective opinion, performing his job duties poorly. Union contends that Lopez cannot show that he was meeting his employer's legitimate expectations, and so has no prima facie case, mandating summary judgment for Union. Alternatively, as is typical in discrimination cases where plaintiff uses the burden-shifting approach, Union contends that even if Lopez has established a prima facie case, Chansler's assessment of Lopez's performance satisfies Union's burden of articulating a legitimate non-discriminatory reason for firing him. Because Lopez, in Union's view, has no evidence tending to prove that Chansler is lying, that is, that his stated reason for terminating Lopez is a pretext for discrimination, Union is entitled to summary judgment.

In response, Lopez urges that "[w]here, as here, the plaintiff's performance is advanced as the legitimate nondiscriminatory reason for his discharge, 'the issue of legitimate performance is best merged with the issue of pretext' because 'to hold otherwise would unnecessarily insulate [the employer] from the burden of articulating a nondiscriminatory reason for the discharge.'" Plaintiff's Brief at 18, *quoting Fisher v. Transco Services–Milwaukee, Inc.*, 979 F.2d 1239, 1243

(7th Cir.1992). A number of cases have specifically approved the "merger" approach to the inquiry, observing that a "'rigid and mechanistic application of the *McDonnell–Douglas* burden-shifting analysis'" complicates the task and so if the plaintiff does not meet his "'burden of showing that [the employer's] explanations are merely a pretext for discrimination, it is not necessary to decide whether [he] also established a prima facie case.'" *Taylor v. Canteen Corp.*, 69 F.3d 773, 780–81 (7th Cir.1995), quoting *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir.1990); *see also Johnson v. City of Fort Wayne, Indiana*, 91 F.3d 922, 936 (7th Cir.1996); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 n. 4 (7th Cir.1994).

More recently, however, the Court of Appeals has noted that "confusion begins" when the plaintiff argues that the employer's legitimate expectations are "phony" because "the issue of legitimate expectations and the issue of pretext *seem* to merge," cautioning that analyzing the case as if they have "would be contrary to the thinking behind the [burden-shifting] formula." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir.1997) (emphasis added). *Coco* instructs that a plaintiff relying solely on the burden-shifting method "must prove that he was meeting (or at least that there is a genuine issue of whether he was meeting) his employer's bona fide expectations, before he can force the employer to produce the reasons for why he was fired or otherwise subjected to adverse action." *Id.* at 1180. If the plaintiff fails to do so, the court should not jump to the pretext inquiry because a plaintiff "cannot get anywhere in such a case merely by trying to prove that he was fired for a reason unrelated to his deficiencies." *Id.*

*Coco's* insistence that the plaintiff first establish the work-performance element of his prima facie case does not require much of a plaintiff, however. A plaintiff's own testimony concerning the quality of his work is enough to establish this element. *Williams v. Williams Electronics, Inc.*, 856

---

5. In its motion for summary judgment Union asserts that Lopez has no direct evidence of discrimination and is relying solely on the burden shifting approach. Lopez does not dispute this assertion in his response. Plaintiff's Response Brief at 17 n. 5.

F.2d 920, 923 n. 6 (7th Cir.1988). If a plaintiff has any objective evidence that he was meeting his employer's expectations, the employer's subjective belief otherwise is not alone sufficient to "derail" the prima facie case. *Pilditch*, 3 F.3d at 1117.

*Coco* therefore must be read carefully. As is made even more clear in the district court's opinion[6] than in the appellate opinion, the plaintiff therein admitted that he was not performing the tasks his employer requested, because he disagreed with his employer that those tasks were important to the job. This provided the thesis for his argument that his employer's legitimate expectations were "phony:" those expectations were ridiculous, and the plaintiff had a better notion of what the job required than did his employer.

■ *Coco* makes sense, then, when understood to hold that a plaintiff cannot make out a prima facie case by proving that he knows more about his job than his employer does, QED, he is meeting what should be his employer's legitimate expectations.[7] A different case is presented when, as at present, the plaintiff does not dispute the substance of his employer's expectations, but instead claims he is meeting them and his employer is saying otherwise to try to cover up discrimination. In such a case, merging the existence of the prima facie case with the issue of pretext, as discussed in *Taylor* and the other cases cited above, continues to make sense.

The court therefore immediately turns to consideration of the issue whether Lopez has any evidence from which a reasonable jury could conclude that Chansler is lying about his subjective assessment of Lopez's work and that the true reason Chansler acted as he did was due to an intent to discriminate against Lopez based upon one (or more) of Lopez's protected characteristics.[8] An important point bears mention at the outset: a *factfinder* would be entitled to disbelieve Chansler's testimony as to his subjective motivation, and the "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 418 (1993).

What evidence would allow a factfinder to: (1) disbelieve Chansler,[9] and; (2) suspect mendacity, that is, that either Chansler or Union is intentionally covering up the true facts? In part, the evidence that would allow a jury to disbelieve Chansler is the same evidence permitting the inference that Lopez

---

6. Which may be read at 1997 WL 89130.

7. *Coco* is thus in harmony with cases reasoning that employers are not to be penalized for poor business judgment, *e.g.*, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir.1989) (employer can "try to force a square peg into a round hole—and throw away the peg when it doesn't fit.") The court questions how far this logic should extend, however.

Suppose (in a situation where there are no similarly-situated employees for comparison) an employer makes truly impossible job demands of a minority employee; for example, that he is expected to meet with clients on opposite sides of town within fifteen minutes of each other, when the trip across town takes at least forty-five minutes. The requirement is, therefore, absurd, and although business behavior is not always rational, we presume it generally to be so, to promote chances of business success. Thus, the requirement's absurdity alone should allow a factfinder to infer that something more than just poor business judgment is afoot: perhaps discrimination, perhaps something that is not discrimination, for example, mere personality conflict. Which inference to draw, or whether to draw any inference

at all, should be left to a jury. Somewhere on the continuum beyond poor business judgment but short of absurdity lie other cases where the employer's job requirements are so unreasonable that a jury should be permitted to evaluate the circumstances and decide whether or not the employer is discriminating under the pretext of making bad business decisions.

8. To resolve any doubts about the matter, however, it should be made clear that the court believes that Lopez has offered sufficient objective evidence—for example, a history of positive job reviews—to establish the "work performance" element of his prima facie case.

9. To say that there must be "evidence" that would allow a factfinder to disbelieve Chansler would seem to be an oxymoron, because a factfinder is always entitled to disbelieve a witness. *See* Instruction 1.02, Pattern Jury Instructions for the Seventh Circuit. Thus, perhaps every case where the employer's proffered non-discriminatory justification for its actions is one person's subjective opinion presents a jury question on which summary judgment is inappropriate.

was meeting his employer's legitimate expectations: that Lopez had for years been receiving excellent performance reviews, and that other employees who in the past had exercised some direction over Lopez's work found him to be an able performer.

■ Union, citing *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 681 (7th Cir.1996), and *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 400 (7th Cir.1992), argues that evidence of Lopez's past performance is irrelevant to the issue whether he was meeting Chansler's expectations later, at the time Chansler decided that Lopez should be discharged. The timing of a decision can support an inference that the explanation for the decision is untruthful, however. *See Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1459 (7th Cir.1994). Chansler's first review of Lopez dropped his rating nearly a full point on the four-point rating scale, after Lopez had received nine years of commendable ratings. It is reasonable to infer that Chansler honestly found fault with Lopez's work that others had not; but it is also reasonable to disbelieve Chansler entirely.

There is other evidence that would allow a reasonable jury to doubt Chansler's explanation. To provide one example, Chansler's preparation of Lopez's January 1995 review (covering Lopez's 1994 performance) varied from Chansler's usual practice. In cases where an employee worked for more than one group leader during a year, Chansler would prepare the review after soliciting comments from each group leader. Chansler Aff. at ¶ 17. Although Lopez had worked for group leader Benak for several months in 1994, Chansler did not consult Benak, in part because he thought Benak's past evaluations of Lopez were too high, and he knew that Benak's opinion would be inconsistent with the opinion of others consulted. Chansler. Chansler Dep.Vol. I at 77, 84; Vol. II at 59–60.

The "others" consulted included Carney, who (allegedly, but assumed true for the purposes of summary judgment) made the "no spics allowed" comment in June 1994, regularly referred to Lopez as a "wetback," and in early 1995 told Lopez that because Lopez was a minority he didn't have to worry about being laid off. Lopez Dep. at 253–54, 473, 363. "Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Dey*, 28 F.3d at 1459.

■ In addition to simply disbelieving Chansler, a reasonable jury could find an air of mendacity about Chansler's testimony, and, as will be explained in a moment, about Union's entire explanation that Chansler was the sole decision-maker. Disbelief accompanied by a suspicion of mendacity, together with the prima facie case, would permit a finding of discrimination and requires the case to be submitted to a jury. *See Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749.

As discussed above, there is evidence that would allow a jury to disbelieve Chansler's testimony that he never heard any derogatory comments directed at Lopez. A reasonable jury could then conclude that Chansler is also testifying untruthfully about his reasons for concluding that Lopez's performance was unsatisfactory. *Cf. Dey*, 28 F.3d at 1459 (court "must assume on summary judgment that Dey complained to Chernoff. A reasonable fact-finder could infer from that fact, and Chernoff's denial of it, that he also testified untruthfully" about a different material fact). That Chansler may be lying about his perceptions of Lopez's work makes consideration of stray discriminatory remarks— Chansler's alleged "lettuce-picking" comment and Chansler's implicit condoning by his silence of the "no spics allowed" comment— relevant to the issue of pretext. *See O'Connor v. DePaul Univ.*, 123 F.3d 665, 671–72 (7th Cir.1997) (collecting cases).

Moreover, there is a conflict in the evidence that raises an issue of fact as to whether it is true that the decision to discharge Lopez was made by Chansler alone. As discussed above, Lopez has directed the court to a March 21, 1995 memo authored by Philip Daum, identifying Lopez as a person to be discharged to meet "staffing reduction goals." Chansler admits that he had not considered discharging Lopez until after discussing staff reductions with Daum. In its

reply, Union argues that Chansler's affidavit in which Chansler states that he was the sole decision-maker stands uncontroverted. The March 21, 1995, memo is itself circumstantial evidence tending to contradict that explanation, however, raising a suspicion of mendacity, allowing—along with Lopez's prima facie case—an inference of discrimination.

In its reply Union also points out that even if Daum made the decision to discharge Lopez, that fact is irrelevant because Lopez admitted in his deposition that he is not claiming that Daum discriminated against him. While Lopez's deposition testimony is troubling, and raises the possibility of a directed verdict at trial, the court does not believe it entitles Union to a summary judgment when the evidence is viewed most favorably to Lopez.

Because Union made the argument in its reply, Lopez has had no chance to respond. Perhaps Lopez was unaware of the document when deposed, and his answer would now be different. In addition, even though Lopez may believe that Daum did not discriminate against him, the existence of the document still makes Union's current explanation for Lopez's discharge smell "fishy." Finally, assuming that Chansler intended to discriminate against Lopez and was looking for an excuse to do so, he could have felt that Daum's judgment of Lopez (assuming Chansler knew of Daum's opinion) provided the perfect opportunity.

In sum, this is a case where, in the words of the Court in *Hicks,* "disbelief of the reasons put forward by the defendant . . . together with the elements of the prima facie case, [may] suffice to show intentional discrimination." *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749. Thus, Union is not entitled to summary judgment on Lopez's claim of discriminatory discharge.

*Claim 4: retaliatory discharge.*

 Using the burden-shifting method to establish a prima facie case of retaliation, Lopez must show (1) that he engaged in legally-protected expression, (2) that he suffered adverse action by his employer, and (3) that a causal link exists between the two events. *See Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,*

104 F.3d 1004, 1014 (7th Cir.1997). Lopez filed a discrimination charge with the EEOC on April 7, 1995, and he was discharged three months later, on July 12, 1995, events making out the first two elements.

Union directs its attention to the third element, arguing that it is entitled to summary judgment because: (1) Lopez has no evidence of a causal connection between his EEOC complaint and his discharge, and (2) even if he does, he has no evidence that Chansler's subjective assessment of his abilities is a pretextual "cover-up" of a retaliatory discharge.

As to the latter argument, there is, as explained above, evidence that would allow a reasonable factfinder to disbelieve Chansler's testimony, and thus find Chansler's explication of his subjective assessment of Lopez to be a pretext for *something.* The evidence that it might be a pretext for a retaliatory discharge is the same evidence that supplies the necessary possibility of a causative link between the event of the EEOC complaint and Lopez's discharge: suspicious timing.

"[S]uspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination." *Hunt–Golliday,* 104 F.3d at 1014; *see also Dey,* 28 F.3d at 1458. In early May, 1995, when Chansler first decided to reduce the drafting department by four employees, Lopez was not high on the list of those who might be selected. Chansler Deposition, Vol. I at 30, 39, 49, 52. In late May that began to change, and no later than June 1, 1995, Chansler decided that Lopez would be one of those discharged. Chansler Deposition, Vol. I at 30, Vol. II at 18–21. Chansler does not recall exactly when he learned that Lopez had filed a discrimination charge with the EEOC, but thinks it was in April or May, 1995. Chansler Deposition, Vol. II at 61. Thus, a reasonable jury could find a temporal link between Chansler's learning of the charge and deciding to discharge Lopez, supporting an inference of a causative link. For this reason, Union has not shown that it is entitled to summary judgment on Lopez's retaliation claim.

For the foregoing reasons, Union's motion for summary judgment is **DENIED.**

**SO ORDERED.**